THE STATE OF OHIO, APPELLANT, *v.* MCKEE, APPELLEE.

[Cite as *State v. McKee* (2001), 91 Ohio St.3d 292.]

(Nos. 00–523 and 00–953—Submitted December 12, 2000—Decided April 11, 2001.)

FRANCIS E. SWEENEY, SR., J. Defendant-appellee, Cassandra N. McKee, was indicted on two counts of corrupting another with drugs, in violation of R.C. 2925.02. At her trial, two girls, Tiffany Friar and Melissa Austin, ages thirteen and fourteen at the time of the alleged crime, testified that appellee, the girlfriend of Tiffany's father, shared a marijuana joint with them while they were traveling in appellee's car.

The incident was discovered when Tiffany wrote a note to another friend, Stacy Cole, and mentioned that she might obtain marijuana from appellee. Stacy's mother found this note in Stacy's bookbag and gave it to Tiffany's mother. Tiffany's mother contacted the sheriff's department. An investigation ensued, and these charges were brought against appellee. Based upon this evidence, the jury convicted appellee as charged.

Upon appeal, the court of appeals reversed appellee's convictions, finding no evidence that the substance involved was marijuana after excluding the girls' testimony identifying it. However, finding its judgment in conflict with that of the Fifth District Court of Appeals in *State v. Coffey* (Oct. 16, 1995), Delaware App. No. 94CAA11036, unreported, 1995 WL 770788 (where the court upheld the use of lay testimony to prove that a substance furnished to minors was marijuana), the appellate court entered an order certifying a conflict. The cause is now before this court upon our determination that a conflict exists (case No. 00–953) and pursuant to the allowance of a discretionary appeal (case No. 00–523).

The appellate court certified the following issue for our review and resolution: "Is there insufficient evidence as a matter of law to convict a defendant for corrupting another with drugs in violation of R.C. 2925.02, when the alleged drug in question is marihuana, and at trial there is no expert witness or laboratory analysis presented to identify the substance alleged to be marihuana, and the only identification of the substance is the testimony of the juveniles who allegedly smoked the substance?" While we affirm the court of appeals' decision reversing

appellee's convictions, we do not believe the issue as framed is dispositive of the case. Because we believe that lay opinion testimony, if properly qualified, may be sufficient to sustain a conviction, we necessarily answer the certified question in the negative.

Appellee was convicted of two counts of corrupting another with drugs in violation of R.C. 2925.02(A)(4)(a), which provides, "No person shall knowingly * * * [f]urnish or administer a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the age of the juvenile or is reckless in that regard." Of these elements, the only one in dispute is that the substance in issue was marijuana, a controlled substance according to R.C. 3719.41 Schedule I, (C)(17). The state offered the testimony of the girls to prove this element of the offense.

Appellant, the state of Ohio, initially contends that this issue was not preserved for appeal because the defense failed to object to the girls' testimony at trial or to raise the issue before the court of appeals. Errors that arise during a trial that are not brought to the attention of the court are ordinarily waived and may not be raised on appeal unless there is plain error, *i.e.*, but for the error, the outcome of the trial clearly would have been otherwise. Crim.R. 52(B); *State v. Johnson* (2000), 88 Ohio St.3d 95, 111, 723 N.E.2d 1054, 1069. We find this case appropriate for a plain-error review. Because there was no additional evidence concerning the identification of the substance, the result of the trial would have been different if the girls' testimony had been excluded.

Having determined that the issue is properly before us pursuant to the plain-error rule, we must decide whether a person can be convicted for corrupting another with drugs, in violation of R.C. 2925.02, based on identification of the controlled substance solely by the person to whom the substance was given.

The state argues that under either Evid.R. 701 or Evid.R. 702, the girls' testimony was properly admitted. Appellee, however, maintains that according to *State v. Maupin* (1975), 42 Ohio St.2d 473, 71 O.O.2d 485, 330 N.E.2d 708, Ohio law requires either laboratory analysis or other expert testimony to prove the identity of the drug. Since the record does not establish that the girls were more than novice users, they could not be considered experts. Thus, in the absence of laboratory testing or expert testimony, appellee argues, the state failed to prove its case.

*Maupin* does not fully answer the issue here. In *Maupin,* the court was asked to decide whether scientific analysis is required for the identification of the substance. In concluding that it is not, the court first determined that a drug may be identified by circumstantial evidence. *Id.,* 42 Ohio St.2d at 479, 71 O.O.2d at 488–489, 330 N.E.2d at 713. Yet the court recognized that the identity of a controlled substance is beyond the common experience and knowledge of juries.

*Id.* At the time *Maupin* was decided, the Rules of Evidence, which govern lay and expert testimony, had yet to be adopted. Therefore, the court followed the established common law and held that expert testimony in some form is required. In this regard, the court considered cases where experienced police officers or drug addicts had been found to be experts and cases where casual drug use was found insufficient for qualification. Based upon these cases, the court concluded that the police officer's testimony in question was properly admitted as expert testimony. *Id.*

However, since the adoption of the Rules of Evidence, both on the state and federal levels,[1] many courts have used an Evid.R. 701 analysis and have allowed lay witnesses to testify about the identity of a drug. For example, in *United States v. Westbrook* (C.A.8, 1990), 896 F.2d 330, the court permitted lay testimony from two witnesses who used the substance at issue and had extensive experience with that type of drug. See, also, *United States v. Osgood* (C.A.5, 1986), 794 F.2d 1087, 1095 (prior use); *United States v. Harrell* (C.A.11, 1984), 737 F.2d 971, 978 (prior use). See, also, *State v. Watson* (1989), 231 Neb. 507, 514, 437 N.W.2d 142, 146 (lay witness's identification of drugs is common); *Swain v. State* (Okla.Crim. App. 1991), 805 P.2d 684, 685–686 (lay testimony sufficient to identify marijuana). Courts have considered familiarity with effects of a drug coupled with similar effects from the substance at issue. See, *e.g., State v. Chatman* (La.App. 1992), 599 So.2d 335, 347; *People v. Garcia* (1985), 166 Cal.App.3d 1056, 1066, 212 Cal.Rptr. 822, 827. Finally, see *State v. Haller* (1987), 178 W.Va. 642, 645, 363 S.E.2d 719, 722 (recognizing that many federal courts have held that drug abusers or addicts may possess sufficient qualifications to identify narcotics). All these cases, however, recognize the importance of a foundation of sufficient familiarity with the substance to support the opinion. To understand why a

---

1. Ohio Evid.R. 701 parallels Fed.R.Evid. 701 before its recent December 2000 amendment. Fed.R.Evid. 701 was amended to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Note of the Judicial Conference Committee on Rules of Practice and Procedure, reprinted in 192 F.R.D. 402, 416. The amendment provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, *and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*" The italicized portion of the rule is new. The amendment now serves to channel testimony that is actually expert testimony to Fed.R.Evid. 702 and ensures that a party will not evade disclosure of expert witnesses by simply calling an expert witness in the guise of a layperson. Committee Note, *supra,* 192 F.R.D. at 416. However, the amendment is not intended to affect either the prototypical types of evidence contemplated by Fed.R.Evid. 701 or, more important, the cases that have permitted lay witnesses to testify that a particular substance appeared to be a narcotic. Committee Note, *supra,* 192 F.R.D. at 417.

foundation is necessary before this testimony is admitted, it is important to consider the language of Evid.R. 701 and its jurisprudence.

Evid.R. 701 provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

At common law, lay witnesses were required to testify to facts rather than opinions. However, the practical possibility of distinguishing between fact and opinion proved to be elusive, if not impossible to draw, and led to extensive litigation and pervasive criticism by commentators. Blanchard & Chin, Identifying the Enemy in the War on Drugs: A Critique of the Developing Rule Permitting Visual Identification of Indescript White Powder in Narcotics Prosecutions (1998), 47 Am.U.L.Rev. 557, 575; *Asplundh Mfg. Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng.* (C.A.3, 1995), 57 F.3d 1190, 1195. Consequently, former Fed.Evid.R. 701, upon which Ohio Evid.R. 701 is based, was adopted, and it "obviated the common law requirement for rigid compartmentalization of lay witness testimony into fact or opinion." 47 Am.U.L.Rev. at 575. Although at first Evid.R. 701 contemplated testimony about such ordinary things as the color, speed, type of vehicle, identity of a person, a person's health, age, or appearance, or even testimony regarding a person's sanity or intoxication under controlled situations, Weissenberger, Ohio Evidence 2001 Courtroom Manual (2000) 275, as case law developed, the rule was interpreted to allow for " ' "shorthand renditions" of a total situation, or [for] statements of collective facts.' " *Asplundh Mfg.*, 57 F.3d at 1196, quoting 1 McCormick, Evidence (4 Ed.1992) 44, fn. 16. Although the line between fact and opinion began to blur, all these situations met the core requirements—that the opinion is rationally based upon personal knowledge and is helpful to the trier of fact. *Id.* at 1198. Moving further from this core of "shorthand statements," courts began to permit witnesses with firsthand knowledge to offer lay opinion testimony "where they have a reasonable basis—grounded either in experience or specialized knowledge—for arriving at the opinion expressed." *Id.* at 1198. Before this type of opinion testimony has been allowed, however, the trial court has made an initial determination that the witness possessed sufficient experience or specialized knowledge, thus satisfying the rule's requirements that the opinion be both "helpful to a clear understanding * * * of a fact in issue" and "rationally based" upon the witness's perception. *Id.*

It is consistent with this emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. The

situation presented in this case fits into this classification. Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702,[2] but rather are based upon a layperson's personal knowledge and experience.

We follow this line of cases and hold that the experience and knowledge of a drug user lay witness can establish his or her competence to express an opinion on the identity of a controlled substance if a foundation for this testimony is first established. This meets the requirements of Evid.R. 701. It is testimony rationally based on a person's perceptions and helpful to a clear understanding of a fact in issue.

Applying our holding to the facts of this case, we find that the evidence was insufficient to show that the girls were qualified to testify as lay witnesses. Their testimony was sketchy and conclusory. Melissa testified that she "assumed it was" marijuana without explaining in detail how she arrived at this conclusion. There was no evidence as to how many prior experiences the girls had had with the drug. While the girls testified that the marijuana was in a "joint" form, neither girl testified as to the actual appearance of the drug itself. Moreover, while Melissa testified in general terms as to the effects of marijuana, she did not

---

2. Evid.R. 702 provides:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

In contrast to Evid.R. 701, Evid.R. 702 authorizes expert testimony. Weissenberger, Ohio Evidence 2001 Courtroom Manual (2000) 281. It establishes standards to be applied in determining whether expert testimony should be admitted, and it provides criteria for determining whether a witness should be accorded expert status by the trial court. *Id.* "[T]he Rule also sets forth the general standard that expert testimony must be reliable, and then narrows this broad standard by applying specific criteria to be used in ascertaining the reliability of expert testimony concerning the results of tests, studies and scientific procedures." *Id.* The distinction between lay and expert witness opinion testimony is that lay testimony "results from a process of reasoning familiar in everyday life," while expert testimony "results from a process of reasoning which can be mastered only by specialists in the field." *State v. Brown* (Tenn.1992), 836 S.W.2d 530, 549.

explicitly say whether she experienced those effects this time. We conclude that there was an insufficient foundation of experience or knowledge to support their opinions. Without a proper foundation, this evidence should have been excluded. The trial court abused its discretion in permitting this lay opinion testimony. Once the evidence is excluded, there is no remaining evidence of this element of the crime. When evidence of an element of the crime is deemed insufficient on appeal, the conviction must be reversed. Plain error requires us to affirm the court of appeals' judgment reversing appellant's convictions.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur. COOK, J., dissents.

---

COOK, J., dissenting. I am in substantial agreement with the rule that the majority announces today. Under Evid.R. 701, a properly qualified lay witness may render an opinion on the identity of a controlled substance. And properly admitted lay opinion testimony may provide sufficient evidence of a substance's identity to support a conviction for corrupting another with drugs. Despite my agreement with these principles, however, I am unable to concur in the ultimate decision to reverse McKee's conviction on the ground that the trial court committed plain error in allowing lay opinion testimony lacking the requisite foundation. I would find no plain error in this case and take this opportunity to clarify the contours of the plain-error doctrine.

Ordinarily, the failure to lodge a timely objection to the admission of testimony results in the forfeiture of any claimed error. See, *e.g., State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675, 684.[3] Crim.R. 52(B) tempers the harsh consequences of failing to object by stating, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention

---

3. We have often referred to the failure to object as a waiver of any error. A failure to object, however, is more accurately characterized as a forfeiture. See *United States v. Olano* (1993), 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508, 519. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.,* quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466. While waiver and forfeiture are not the same, courts "have so often used them interchangeably that it may be too late to introduce precision." *Freytag v. Commr. of Internal Revenue* (1991), 501 U.S. 868, 894, 111 S.Ct. 2631, 2647, 115 L.Ed.2d 764, 790, fn. 2 (Scalia, J., concurring). Nevertheless, the distinction retains some significance in the context of Crim.R. 52(B). A right that is waived in the true sense of that term cannot form the basis of any claimed error under Crim.R. 52(B). *Olano,* 507 U.S. at 733, 113 S.Ct. at 1777, 123 L.Ed.2d at 519. On the other hand, mere forfeiture does not extinguish a claim of plain error under Crim.R. 52(B). *Id.*

of the court." The rule is identical to Fed.R.Crim.P. 52(b), which the United States Supreme Court has described as a " 'careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.' " *United States v. Young* (1985), 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12–13, quoting *United States v. Frady* (1982), 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816, 827. This court has repeatedly stated that plain error under Crim.R. 52(B) will not exist unless we can conclude that but for the error, the outcome of the trial would clearly have been otherwise. See, *e.g., State v. Lindsey* (2000), 87 Ohio St.3d 479, 482, 721 N.E.2d 995, 1001; *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899; *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Accordingly, appellate courts should not take notice of an error, no matter how clear, if the error had no bearing on the outcome of the trial.

Today, the majority finds an outcome-determinative error in the admission of lay opinion testimony and decides that the plain-error doctrine "requires us to" uphold the court of appeals' reversal of McKee's conviction. But the outcome-determinative nature of an error is not the only factor to consider in deciding whether to notice the error under Crim.R. 52(B). To the contrary, the prejudicial nature of the forfeited error is only one element to be satisfied before the appellate court may correct the error.

In *United States v. Olano* (1993), 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508, the United States Supreme Court clarified the standard for plain-error review under Fed.R.Crim.P. 52(b). The court explained that three limitations circumscribe an appellate court's decision whether to correct an error absent a timely objection by the defendant at trial. First and most fundamentally, there must be error, *i.e.,* a deviation from a legal rule. *Id.* at 732–733, 113 S.Ct. at 1777, 123 L.Ed.2d at 518. Second, the error must be plain. To be plain, the error must be " 'clear' or, equivalently, 'obvious.' " *Id.* at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519, citing *Young,* 470 U.S. at 17, 105 S.Ct. at 1047, 84 L.Ed.2d at 13, fn. 14. Third, the error must affect substantial rights. In most cases, this means that the error must have affected the outcome of the trial. *Olano,* 507 U.S. at 734, 113 S.Ct. at 1777–1778, 123 L.Ed.2d at 519–520.

Even if a forfeited error satisfies these three prongs, however, an appellate court need not correct it. By its very terms, Crim.R. 52(B) is discretionary; a reviewing court "may" notice plain errors but is not obliged to do so. *Id.* at 735, 113 S.Ct. at 1778, 123 L.Ed.2d at 520. We have recognized this discretionary aspect of the rule by instructing courts to take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus; see, also,

*Young,* 470 U.S. at 15, 105 S.Ct. at 1046, 84 L.Ed.2d at 12. *Olano* further explained that an appellate court should exercise its discretion to correct plain errors affecting substantial rights "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano,* 507 U.S. at 736, 113 S.Ct. at 1779, 123 L.Ed.2d at 521, quoting *United States v. Atkinson* (1936), 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557. At a minimum, appellate courts "should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant." *Id.* But plain-error correction under Crim.R. 52(B) is not limited to cases of actual innocence. *Id.*

I would adopt the *Olano* method of analyzing when to correct plain error under Crim.R. 52(B). *Olano*'s framework is true to the text of the rule, which by its very terms circumscribes the authority of an appellate court to correct plain error. *Olano,* 507 U.S. at 732, 113 S.Ct. at 1776, 123 L.Ed.2d at 518. In contrast, an analytic framework *requiring* reviewing courts to correct an outcome-determinative forfeited error ignores two vital limitations embodied in Crim.R. 52(B)'s text: the type of error ("plain") that can be corrected and the court's discretion (plain errors "may be noticed") in deciding whether to correct it.

Utilizing the *Olano* framework, I would conclude that reversal is not warranted in this case. Under the rule announced by the majority today, the admission of lay opinion testimony concerning the identity of a controlled substance is erroneous unless the proponent of the testimony establishes a proper foundation for it. This rule arguably establishes the first prong of the *Olano* plain-error analysis, *i.e.,* an error having been committed. This case fails to satisfy *Olano*'s second prong, however, because the error recognized by the majority is not plain. To be plain, an error must be obvious in light of the law at the time of appeal. See *Johnson v. United States* (1997), 520 U.S. 461, 467–468, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718, 727–728; accord *State v. Marple* (1996), 197 W.Va. 47, 53, 475 S.E.2d 47, 53 (applying *Olano*). But the rule announced today was not clear at the time of appeal; to the contrary, there was a conflict in the districts (concerning the admissibility of lay opinion testimony identifying a controlled substance) that was unresolved until this court's decision today. And the court of appeals cited no controlling decision from its own district establishing that the admission of the girls' testimony was error. Several federal appellate courts applying the *Olano* analysis have held that an error cannot be deemed plain if there is no controlling case law on point and the authority in other circuits is split. See, *e.g., United States v. Aguillard* (C.A.11, 2000), 217 F.3d 1319, 1321; *United States v. Thompson* (C.A.9, 1996), 82 F.3d 849, 855; *United States v. Alli–Balogun* (C.A.2, 1995), 72 F.3d 9, 12; *United States v. Williams* (C.A.6, 1995), 53 F.3d 769, 772. Simply put, if the law is unclear on a particular issue at the time of trial and remains that way at the time of appeal, the error cannot be plain and

should not be noticed under Crim.R. 52(B). See *United States v. David* (C.A.4, 1996), 83 F.3d 638, 642–643. As the *David* court explained:

"If the contemporaneous objection requirement is to have any real force, presumably an objection would be required * * * in the circumstance where the law at the time of trial is unclear as to whether the [trial] court's proposed course would constitute error. A timely objection in such a circumstance would provide the court an opportunity to consider the question, possibly avoid the commission of an error, and thereby prevent the need for retrial upon appellate reversal—the very purposes of the contemporaneous objection rule." (Footnote omitted.) *Id.* at 643.

In this case, it was not clear either at the time of trial or by the time of the direct appeal that the girls' testimony identifying marijuana was inadmissible.[4] I therefore cannot join in the majority's determination that the trial court committed plain error by failing to follow a rule that was not definitively announced until today.

I would adopt the *Olano* framework for analyzing plain error under Crim.R. 52(B) and find that any error committed by the trial court in this case was not plain.

---

*Jim Slagle,* Marion County Prosecuting Attorney, for appellant.

*Daniel E. Shifflet & Co., L.P.A.,* and *Kevin P. Collins,* for appellee.

---

4. The *David* court distinguished the situation where the law was clear at the time of trial (and contrary to the defendant's position on appeal), but changed by the time of appeal by a supervening decision. In that instance, the *David* court held that an error would be deemed plain "where an objection at trial would have been indefensible because of existing law, but a supervening decision prior to appeal reverses that well-settled law, rendering the defendant's claim clearly meritorious." 83 F.3d at 645. The United States Supreme Court adopted this view in *Johnson,* holding that "in a case * * * where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States,* 520 U.S. at 468, 117 S.Ct. at 1549, 137 L.Ed.2d at 727–728. This case presents no such situation.

IN RE ELECTION CONTEST OF DECEMBER 14, 1999 SPECIAL ELECTION
FOR THE OFFICE OF MAYOR OF THE CITY OF WILLOUGHBY HILLS.

[Cite as *In re Election Contest of Dec. 14, 1999 Special
Election* (2001), 91 Ohio St.3d 302.]

(No. 00–628—Submitted January 9, 2001—Decided April 11, 2001.)

*Per Curiam.* At the November 2, 1999 general election, appellant and cross-appellee, Ted Dellas, appellee and cross-appellant, Morton E. O'Ryan, and two other individuals were candidates for the office of Mayor of the city of Willoughby Hills, Ohio. Dellas and O'Ryan received the highest number of votes, but neither received a majority. Therefore, under the Willoughby Hills Charter, a special mayoral election between Dellas and O'Ryan was held on December 14, 1999.

Both Dellas and O'Ryan participated in a program of the Lake County Board of Elections in which, in the weeks before the election, they received lists of electors who had requested and submitted absentee ballots for the December 14, 1999 special election. This list of absentee voters as well as all pertinent records, including applications for absentee ballots, was available for inspection at the board of elections. In addition, the board, in accordance with R.C. 3503.23, made available for public inspection an official registration list of all electors eligible to vote in the special election.

By applications signed and dated on November 22, 1999, William J. and Eleanor L. McFarlane requested absentee ballots for the special election because they would be absent from the county on December 14. They requested that the absentee ballots be mailed to an address in Texas. The McFarlanes completed the ballots and sent them back to the board in time for the special election. The McFarlanes have been registered voters in Lake County since September 1972 and have voted in all county elections since that date with the sole exception of the 1973 general election. No one challenged the qualifications of the McFarlanes to vote in the special election before the results were certified.

Following the special election, the director of the board of elections, Janet F. Clair, learned that the McFarlanes had registered to vote in Texas but that they had never voted in that state. Clair believed that the McFarlanes' Texas

registration was probably unintentional because they subsequently canceled that registration. The board had not been aware of the McFarlanes' Texas registration before the special election.

In November 1999, the board also received requests from Mark Pogany, Amy Penfield, and Jeanette C. Jilek for absentee ballots for the December 14, 1999 special election. The board subsequently received ballots sealed in the identification envelopes specified in R.C. 3509.04 and signed and dated by Pogany and Penfield, and purportedly by Jilek. No one raised the issue of the propriety of these absentee ballots until after the special election. The board compared the signatures on the absentee-ballot applications with those signatures on the identification envelopes of the returned absentee ballots and determined that they matched.

On December 27, 1999, the board certified the results of the December 14 special election: 1,179 votes for O'Ryan and 1,173 votes for Dellas. Before the certification of the election, Director Clair had investigated potential irregularities that had been brought to her attention and reported her written findings to the board. As part of her report, Clair found that in Precinct BB at the special election, the poll book and signature book reflected that there had been three hundred eighty voters, but the voting machines indicated that there had been three hundred seventy-eight votes. Clair also noted that in Precinct CC, the poll book and the signature book specified three hundred twenty-four votes, but the voting machines recorded three hundred twenty-seven votes. The poll books did not reveal any reasons for these discrepancies,[1] but the poll workers noted that in Precinct BB, there were two "fleeing voters," *i.e.* voters who signed in to vote but left without voting.

Because the winning margin for O'Ryan over Dellas in the special election was less than one-half of one percent of the total vote, the board conducted a recount pursuant to R.C. 3515.011 on January 1, 2000. On that same date, the board certified the same result as the original count: 1,179 votes for O'Ryan and 1,173 for Dellas, *i.e.*, a margin of six votes.

On January 10, 2000, Dellas filed an election contest under R.C. 3515.08 in the Lake County Court of Common Pleas to challenge O'Ryan's election as mayor. In his petition, Dellas claimed that certain irregularities had occurred, including the different recorded vote totals for the poll and signature books and machines in Precincts BB and CC. Dellas requested that the court pronounce judgment on

---

1. R.C. 3501.26(E) provides that "[i]f the number of voted ballots exceeds the number of voters whose names appear upon the poll books, the presiding judge shall enter on the poll books an explanation of such discrepancy, and such explanation, if agreed to, shall be subscribed to by all of the judges." See, also, R.C. 3505.26(E).

which candidate had been elected or if it could not pronounce judgment for either candidate, that the court declare the result uncertain and void the election.

At trial, Dellas introduced evidence from a document and handwriting expert that Pogany's and Penfield's applications for absentee ballots had been signed by persons other than Pogany and Penfield. The expert further testified, however, that the identification envelopes for the completed absentee ballots of Pogany and Penfield contained their genuine signatures. Neither Pogany nor Penfield testified.

Jeanette Jilek and her husband, Edward, testified that Edward signed Jeanette's name on her absentee ballot at her request because she was too ill to sign it. Jeanette voted for O'Ryan.

Director Clair specified that Dellas could have objected to these absentee ballots as well as the McFarlanes' absentee ballots before the election but failed to do so.

In March 2000, the common pleas court found that the three votes of Pogany, Penfield, and Jilek were invalid and reduced the number of votes certified for O'Ryan to 1,176, which was still three more than the 1,173 votes for Dellas. The court held that O'Ryan had been elected Mayor of Willoughby Hills. In so holding, the court rejected Dellas's claims that the McFarlanes were ineligible to vote because of their Texas registration and that vote disparities in Precincts BB and CC constituted election irregularities.

This cause is now before the court upon Dellas's appeal and O'Ryan's cross-appeal under R.C. 3515.15 from the judgment of the court of common pleas.

In his appeal, Dellas requests that we reverse the judgment of the court of common pleas and declare the results of the December 14, 1999 special mayoral election uncertain and consequently void. In his cross-appeal, O'Ryan asserts that the trial court erred in deducting two votes from O'Ryan's total based on Pogany's and Penfield's absentee votes, but that the court correctly ruled that Dellas had failed to prove that the claimed election irregularities affected enough votes to change or make uncertain the election results.

In evaluating these claims, we are guided by several well-established principles, none more important than that " 'our citizens must be confident that *their vote*, cast for a candidate or an issue, *will not be disturbed except under extreme circumstances that clearly affect the integrity of the election.*' " (Emphasis added.) *In re Election Contest of Democratic Primary Held May 4, 1999 for Clerk, Youngstown Mun. Court* (2000), 88 Ohio St.3d 258, 263, 725 N.E.2d 271, 275, quoting *In re Election of Nov. 6, 1990 for the Office of Atty. Gen. of Ohio* (1991), 58 Ohio St.3d 103, 105, 569 N.E.2d 447, 450.

To give full effect to this vote, we will refrain from disturbing an election result unless the evidence establishes that the result was contrary to the will of the electorate, and we must indulge every presumption in favor of upholding the validity of an election and against ruling it void. *Portis v. Summit Cty. Bd. of Elections* (1993), 67 Ohio St.3d 590, 592, 621 N.E.2d 1202, 1203; *Beck v. Cincinnati* (1955), 162 Ohio St. 473, 475, 55 O.O. 373, 374, 124 N.E.2d 120, 122.

Moreover, under the applicable standard, in order to prevail in his contest of the December 14, 1999 special mayoral election, Dellas had to prove by clear and convincing evidence that one or more election irregularities occurred and that the irregularity or irregularities affected enough votes to change or make uncertain the result of the special election. *In re Election Contest of Democratic Primary*, 88 Ohio St.3d at 263, 725 N.E.2d at 275–276, citing *In re Election of Nov. 6, 1990*, 58 Ohio St.3d 103, 569 N.E.2d 447, at syllabus.

With these standards providing the applicable framework, we next consider the parties' claims. O'Ryan defeated Dellas by six votes in the certified vote by the board, but the trial court determined that O'Ryan's margin of victory should be reduced to three because the board should have rejected the absentee votes of Pogany, Penfield, and Jilek. O'Ryan now concedes that Jilek's vote was unlawfully cast and constituted an election irregularity.

### O'Ryan's Cross–Appeal: Absentee Ballots of Pogany and Penfield

O'Ryan claims that the trial court erred in reducing his vote total by the two votes that Pogany and Penfield cast by absentee ballot. The trial court relied on the testimony of Dellas's handwriting expert to conclude that Pogany and Penfield were not eligible to vote by absentee ballot because their written applications for absentee ballots were not signed by them. R.C. 3509.03 requires that written applications for absentee ballots "shall be signed by the applicant."

Dellas claims that because of R.C. 3515.12, he properly challenged the Pogany and Penfield absentee ballots in his election contest. But the portion of R.C. 3515.12 that Dellas cites merely provides that "[a]ny witness who voted at the election may be required to answer touching his qualification as a voter and for whom he voted." In contrast to the evidence introduced regarding his objection to Jilek's absentee ballot, Dellas did not introduce the testimony of either Pogany or Penfield concerning their absentee-ballot applications, nor did he introduce any evidence of their unavailability to testify. Cf. *In re Election of Swanton Twp.* (1982), 2 Ohio St.3d 37, 39, 2 OBR 581, 583, 442 N.E.2d 758, 760 ("It is indeed noteworthy that while contestors-appellants named seven individuals in their answers to interrogatories who allegedly were permitted to vote on the zoning case though ineligible, these individuals were not called as witnesses").

More important, although "all provisions of election laws are mandatory in the sense that they impose the duty of obedience upon those who come within their purview, * * * irregularities, which were not caused by fraud and which have not interfered with a full and fair expression of the voters' choice, should not effect a disfranchisement of the voters." *Mehling v. Moorehead* (1938), 133 Ohio St. 395, 406, 11 O.O. 55, 59, 14 N.E.2d 15, 20; *State ex rel. Foreman v. Brown* (1967), 10 Ohio St.2d 139, 151, 39 O.O.2d 149, 156, 226 N.E.2d 116, 124.

Dellas did not introduce clear and convincing evidence of fraud in Pogany's and Penfield's alleged failure to comply with the application-signature requirement of R.C. 3509.03. Moreover, the uncontroverted evidence is that Pogany and Penfield are qualified electors who fully complied with the absentee-ballot requirements of R.C. 3509.04, *i.e.*, they declared under penalty of election falsification that they would be absent from Lake County on the date of the election and they signed the identification envelopes containing their ballots. Even Dellas's handwriting expert testified that Pogany and Penfield had signed the voter-statement of the identification envelopes. There is no evidence that some unknown, unqualified persons improperly cast their absentee ballots.

Therefore, based on *Mehling* and *Foreman*, we hold that the court erred in finding that Pogany's and Penfield's absentee ballots should be rejected and used to reduce O'Ryan's margin of victory from five votes (after deducting Jilek's vote) to three votes. In the absence of a preelection challenge or clear and convincing evidence of fraud, the claimed violation of R.C. 3509.03 is insufficient to disenfranchise Pogany and Penfield. We must give full and fair expression to their right to vote.

### Dellas Appeal: Absentee Ballots of the McFarlanes

Dellas contends that the two absentee votes of the McFarlanes should have been rejected because they were ineligible to vote. Dellas claims that R.C. 3503.21 and 3503.33 prohibited the McFarlanes from voting in Ohio when they were also registered in Texas.

Neither R.C. 3503.21 nor 3503.33 required the board to reject the McFarlanes' ballots. Under R.C. 3503.21(B), "[t]he registration of any elector identified as having changed his voting residence to a location outside his current county of registration shall not be canceled unless the registrant is sent a confirmation notice on a form prescribed by the secretary of state and the registrant fails to respond to the confirmation notice or otherwise update his registration and fails to vote in any election during the period of two federal elections subsequent to the mailing of the confirmation notice." The McFarlanes' Lake County, Ohio registration was never canceled. R.C. 3503.33 involves electors applying for voter registration in an Ohio county when they had already registered in another

state or another county. The McFarlanes, however, were registered to vote in Lake County, Ohio, when they registered in Texas.

Moreover, there is no evidence of fraud by the McFarlanes. *Mehling,* 133 Ohio St. at 406, 11 O.O. at 59, 14 N.E.2d at 20; *Foreman,* 10 Ohio St.2d at 151, 39 O.O.2d at 156, 226 N.E.2d at 124. Instead, the evidence establishes that they have a lengthy history of voting in Lake County, Ohio, and that their registration in Texas was inadvertent. In fact, they never voted in Texas and subsequently canceled their Texas registration.

Therefore, the trial court properly held that the board did not have to reject the McFarlanes' absentee ballots.

### The Dellas Appeal: Vote Disparities in Precincts BB and CC

Dellas contends that the differences between the vote totals for the poll and signature books and the voting machines in Precincts BB and CC are election irregularities that render the election result uncertain. In Precinct BB, the poll and signature books recorded two more voters than the voting machines. In Precinct CC, the poll and signature books recorded three fewer voters than the voting machines. Dellas asserts that although one of the two "missing" machine votes in Precinct BB could be attributed to a voter who signed in and left without voting, the rest of the votes (one in Precinct BB and three in Precinct CC) remained unexplained.[2] These claimed irregularities could not have been raised before the election.

We have held that differences between vote totals in poll books and voting machines constitute clear and convincing evidence of election irregularities in an election contest. *In re Election of Nov. 6, 1990,* 58 Ohio St.3d at 120, 569 N.E.2d at 462.

Therefore, the trial court erred by concluding that these vote discrepancies were not irregularities.

Nevertheless, even if these four votes were deducted from the corrected victory margin of five votes, *i.e.,* the original six-vote margin minus Jilek's vote, it is still insufficient to change or make uncertain the election result. In other words, O'Ryan would still have been elected mayor.

### Conclusion

Although Dellas established the presence of irregularities in the December 14, 1999 special mayoral election, the common pleas court properly denied the

---

2. Although the poll and signature books for Precinct FF also recorded one more vote than the voting machines for that precinct, Dellas does not assert on appeal that this is an irregularity. This vote was accounted for by evidence that one person had signed in and entered a voting machine but failed to cast a vote on the machine.

contest. This is not a case in which "extreme circumstances" manifestly affected the "integrity of the election." *In re Election Contest of Democratic Primary*, 88 Ohio St.3d at 267, 725 N.E.2d at 279. "Our holding is in accordance with the tendency of this court to insist * * * that after an election, unless it is shown that the result was contrary to the will of the electorate, it will not be disturbed." *Mehling*, 133 Ohio St. at 408, 11 O.O. at 60, 14 N.E.2d at 21. We have "long adhered to the position that, '[t]he survival of our system of government requires that proper respect be given to the will of the people as expressed at the ballot box.'" *Swanton Twp.*, 2 Ohio St.3d at 38, 2 OBR at 582, 442 N.E.2d at 759, quoting *MacDonald v. Bernard* (1982), 1 Ohio St.3d 85, 86, 1 OBR 122, 123, 438 N.E.2d 410, 412. Dellas did not establish that the result of the special election was contrary to the will of the electorate. In fact, proper respect for the will of the people in general and for absentee voters such as the McFarlanes, Pogany, and Penfield in particular requires a finding upholding the election result. Therefore, we affirm the judgment of the court of common pleas denying the election contest.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Donald J. McTigue*, for appellant and cross-appellee.
*Michael E. Murman*, for appellee and cross-appellant.

---

BOARD OF EDUCATION OF THE CINCINNATI SCHOOL DISTRICT, APPELLANT, *v.* HAMILTON CTY. BD. OF REVISION; MIRGE CORPORATION, APPELLEE.

[Cite as *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision* (2001), 91 Ohio St.3d 308.]

(No. 00–692—Submitted November 28, 2000—Decided April 11, 2001.)

MOYER, C.J.   In 1998, subsequent to our decision in *Sharon Village Ltd. v. Licking Cty. Bd. of Revision* (1997), 78 Ohio St.3d 479, 678 N.E.2d 932, the General Assembly enacted Sub.H.B. No. 694, effective March 30, 1999, 147 Ohio Laws, Part III, 5373.   The bill became law without the signature of the Governor. *Id.* at 5378.   The preamble to the legislation characterized its purpose to be "to amend sections 5715.13[1] and 5715.19 of the Revised Code to clarify who may file a complaint [challenging real property valuation assessments] with a county board of revision." *Id.* at 5373.   The amended statutes permit the filing of a complaint by a person owning taxable property and also by certain persons who are not lawyers.[2]   As relevant herein, amended R.C. 5715.19 authorizes corporate officers to file valuation complaints on behalf of their corporation.

---

1.  R.C. 5715.13, as amended by Sub.H.B. No. 694, provides:
    "The county board of revision shall not decrease any valuation unless a party affected thereby or who is authorized to file a complaint under section 5715.19 of the Revised Code makes and files with the board a written application therefor, verified by oath, showing the facts upon which it is claimed such decrease should be made."

2.  R.C. 5715.19(A)(1), as amended by Sub.H.B. No. 694, authorizes the following nonlawyers to file tax reduction complaints on behalf of real property owners: "an individual who is retained by [the

The syllabus to *Sharon Village* provides, "The preparation and filing of a complaint with a board of revision on behalf of a taxpayer constitute the practice of law." *Sharon Village* reaffirmed existing precedent that the filing of a verified complaint pursuant to R.C. 5715.13 and 5715.19 is requisite to the vesting of jurisdiction in a board of revision, and failure to fully and properly complete the complaint justifies dismissal of the action. *Id.,* 78 Ohio St.3d at 481, 678 N.E.2d at 934, citing *Stanjim Co. v. Mahoning Cty. Bd. of Revision* (1974), 38 Ohio St.2d 233, 67 O.O.2d 296, 313 N.E.2d 14. In *Sharon Village* we affirmed the dismissal, for lack of jurisdiction, of a valuation complaint prepared and filed on behalf of a corporation by a nonattorney, who was thereby engaging in the unauthorized practice of law.

Sub.H.B. No. 694 also created an exception to the general rule set forth in R.C. 5715.19(A)(2)[3] that a real property taxpayer is, in the absence of a showing of a change in circumstances, prohibited from filing successive valuation complaints in the same triennium. See *Elkem Metals Co., L.P. v. Washington Cty. Bd. of Revision* (1998), 81 Ohio St.3d 683, 693 N.E.2d 276. This exception provides that "[i]f a county board of revision, the board of tax appeals, or any court dismisses a complaint filed under [section 5715.19] or section 5715.13 of the Revised Code for

---

owner or the owner's spouse] and who holds a designation from a professional assessment organization, such as the institute for professionals in taxation, the national council of property taxation, or the international association of assessing officers, a public accountant who holds a permit under section 4701.10 of the Revised Code, a general or residential real estate appraiser licensed or certified under Chapter 4763. of the Revised Code, or a real estate broker licensed under Chapter 4735. of the Revised Code, who is retained by such a person; if the person is a firm, company, association, partnership, limited liability company, or corporation, an officer, a salaried employee, a partner, or a member of that person; if the person is a trust, a trustee of the trust." 147 Ohio Laws, Part III, 5373–5374.

3. R.C. 5715.19(A)(2) provides, just as it did before the enactment of Sub.H.B. No. 694, as follows:
"As used in division (A)(2) of this section, 'interim period' means, for each county, the tax year to which section 5715.24 of the Revised Code applies and each subsequent tax year until the tax year in which that section applies again.
"No person, board, or officer shall file a complaint against the valuation or assessment of any parcel that appears on the tax list if it filed a complaint against the valuation or assessment of that parcel for any prior tax year in the same interim period, unless the person, board, or officer alleges that the valuation or assessment should be changed due to one or more of the following circumstances that occurred after the tax lien date for the tax year for which the prior complaint was filed and that the circumstances were not taken into consideration with respect to the prior complaint:
"(a) The property was sold in an arm's length transaction, as described in section 5713.03 of the Revised Code;
"(b) The property lost value due to some casualty;
"(c) Substantial improvement was added to the property;
"(d) An increase or decrease of at least fifteen percent in the property's occupancy has had a substantial economic impact on the property."

the reason that the act of filing the complaint was the unauthorized practice of law or the person filing the complaint was engaged in the unauthorized practice of law, the party affected by a decrease in valuation or the party's agent, or the person owning taxable real property in the county or in a taxing district with territory in the county, may refile the complaint, notwithstanding division (A)(2) of this section." R.C. 5715.19(A)(3), 147 Ohio Laws, Part III, 5374–5375.

In addition, Sub.H.B. No. 694 included the following uncodified language in Section 3 of the Act:

"The amendment by this act of sections 5715.13 and 5715.19 of the Revised Code is remedial legislation and applies to any complaint that was timely filed under either of these sections respecting valuations for tax year 1996 or 1997, and to complaints filed for tax years 1998 and thereafter. Notwithstanding division (A)(2) of section 5715.19 of the Revised Code, any person authorized by this act to file a complaint under section 5715.13 or 5715.19 of the Revised Code that timely filed a complaint for tax year 1996 or 1997 may file a complaint under those sections, as amended by this act, on or before March 31, 1999, respecting valuations for tax year 1996, 1997, or 1998, and the board of revision shall proceed to hear the complaint as otherwise provided under Chapter 5715. of the Revised Code." [4] 147 Ohio Laws, Part III, 5378.

This court considered a valuation complaint filed prior to the effective date of Sub.H.B. No. 694 by appellant herein, Mirge Corporation, d.b.a. Electrical Mechanics ("Mirge"), in *Worthington City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision* (1999), 85 Ohio St.3d 156, 707 N.E.2d 499.[5] That complaint had been prepared, signed and filed on behalf of the corporation by Mirge's vice president, rather than an attorney, and challenged the assessed value of the corporation's property located at 2570 Gobel Court in Cincinnati for tax year 1996. In finding that the complaint failed to vest jurisdiction in the board of revision, we reaffirmed our prior holding that a " 'corporation cannot maintain litigation *in propria persona,* or appear in court through an officer of the corporation or an appointed agent not admitted to the practice of law.' " *Id.* at 160, 707 N.E.2d at 502, quoting *Union Savings Assn. v. Home Owners Aid, Inc.* (1970), 23 Ohio St.2d 60, 52 O.O.2d 329, 262 N.E.2d 558, syllabus.

---

4. Subsequently, Sections 149 and 150 of Am.Sub.H.B. No. 283 authorized refiling of complaints relative to tax years 1994 and 1995 as well, and extended the deadline for refiling until March 31, 2000.

5. The opinion cited as *Worthington City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision* (1999), 85 Ohio St.3d 156, 707 N.E.2d 499, in fact resolved four cases consolidated by this court, including *Mirge Corp. v. Hamilton Cty. Bd. of Revision* (1998), case No. 97–2423, 82 Ohio St.3d 1437, 694 N.E.2d 1374.

On March 30, 1999, Mirge filed a new complaint, the subject of this appeal, with the Hamilton County Board of Revision, as authorized by Sub.H.B. No. 694. This was, in effect, a refiling of the complaint at issue in *Worthington City School Dist. v. Franklin Cty. Bd. of Revision, supra.* The complaint again contested the assessed value of its real property at 2570 Gobel Court in Cincinnati for tax year 1996.

Mirge asserted that the property's taxable value should be reduced from $227,920 to $47,575. It contended that the lowered valuation corresponded to the actual sales price of the property when Mirge acquired it on August 8, 1995. The 1999 Mirge complaint, which was executed on a printed form, listed attorney Franklin A. Klaine, Jr., as agent for Mirge. Klaine also signed the bottom of the complaint form as "Franklin A. Klaine, Jr., Attorney for Mirge Corp." In addition, the 1999 complaint bore the sworn signature of Walter Higginbothan, vice president of Mirge, who signed as "complainant or agent," indicating his declaration under penalty of perjury that the complaint had been examined by him and was true, correct, and complete to the best of his knowledge and belief. A notary public, separate from attorney Klaine, notarized Higginbothan's declaration.

Thereafter a countercomplaint was filed by the Board of Education of the Cincinnati School District ("board of education"), appellant herein, asserting that the auditor's taxable value of $227,920 for the property was correct based on a fair market value of the property of $651,200 rather than $135,900 as asserted by Mirge.

The board of revision held a hearing on July 6, 1999, at which attorney Klaine appeared on behalf of Mirge. The board considered the hearing as involving not only the 1999 complaint as to tax year 1996 but also subsequent tax years 1997, the complaint for which had been dismissed, and 1998. Thus, the hearing sought to determine the taxable values for the Mirge property for all three tax years, 1996 through 1998.

At the hearing, Higginbothan testified that he had prepared the 1999 complaint relating to the 1996 tax year valuation, and Klaine represented that his office had filed the complaint. Higginbothan further testified that on July 28, 1995, Mirge purchased the subject property for $135,900.

The board of revision granted the reduction as requested by Mirge, effective for tax years 1996, 1997, and 1998, setting the fair market value of the parcel at $135,900, its 1995 purchase price. The board of education appealed to the Board of Tax Appeals. The parties stipulated that the appeals for tax years 1996, 1997, and 1998 filed by the board of education should be consolidated.

The Board of Tax Appeals found no procedural obstacle to its jurisdiction pursuant to *Sharon Village* and its progeny, in that attorney Klaine had reviewed

and signed the complaint, filed it, and had appeared as counsel of record in the legal proceedings which ensued. It further found that the evidence supported the determinations of value made by the board of revision for each of the three years in question. It therefore ordered the Auditor of Hamilton County to value the property at a fair market value of $135,900 ($47,560 tax value).

The cause is now before this court upon an appeal as of right.

This appeal presents two issues for our resolution. The first is jurisdictional and questions whether the Board of Tax Appeals should have dismissed the appeal, pursuant to *Sharon Village* and its progeny, *i.e.*, *Lakeside Ave. L.P. v. Cuyahoga Cty. Bd. of Revision* (1999), 85 Ohio St.3d 125, 707 N.E.2d 472; *Worthington City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 85 Ohio St.3d 156, 707 N.E.2d 499; *Fravel v. Stark Cty. Bd. of Revision* (2000), 88 Ohio St.3d 574, 728 N.E.2d 393; *C.I.A. Properties v. Cuyahoga Cty. Aud.* (2000), 89 Ohio St.3d 363, 731 N.E.2d 680, because a nonattorney had prepared the complaint filed on behalf of corporate taxpayer Mirage. We affirm the finding of the Board of Tax Appeals that the precedent set forth in *Sharon Village* does not mandate dismissal of the case now before us.

The second issue is whether Sub.H.B. No. 694 is valid insofar as it purports to permit a taxpayer to file a second complaint for tax years 1996 and 1997 when previous complaints for those tax years had been dismissed pursuant to *Sharon Village*. We reverse the order of the board on this issue because application of this portion of Sub.H.B. No. 694, authorizing the refiling of dismissed complaints challenging valuations for tax years prior to the effective date of Sub.H.B. No. 694, violates Section 28, Article II of the Ohio Constitution, which prohibits the enactment of retroactive legislation.

I

*Jurisdictional Issue*

The facts in *Sharon Village* are distinguishable from the facts in the case at bar. In *Sharon Village*, a nonattorney both prepared *and* filed complaints in the board of revision without the involvement of, or supervision by, a licensed attorney. In addition to preparing legal documents, the nonattorney also gave professional advice and appeared before a board of revision on behalf of corporate clients. He acted in his capacity as president of an entity known as Ambassador Research, Inc. We held that the nonattorney had engaged in the unauthorized practice of law and, accordingly, that jurisdiction had never vested in the board of revision upon the preparation and filing of a valuation complaint by him.

The Board of Tax Appeals found in the instant case that "one of Mirge's corporate officers prepared the subject complaint. It was then submitted to an

attorney licensed to practice in Ohio, who reviewed the complaint, executed the complaint with his signature, and thereafter filed the complaint with the county auditor for presentation to the Board of Revision * * *, represented Mirge before the Board of Revision," and appeared before the Board of Tax Appeals. These findings of fact are directly supported by the record or are factual inferences that can be reasonably drawn from evidence in the record.

In the case at bar, the nonattorney did not prepare and file the complaint as had the nonattorney in *Sharon Village*. Rather, he drafted and verified the factual allegations it contained. He then transmitted it to attorney Klaine for review and filing. Klaine, not Higginbothan, initiated the proceedings by filing, or directing the filing, of a valid complaint so as to vest jurisdiction in the board of revision. Thereafter Mirge was represented throughout these proceedings by attorney Klaine.

Preparation of a complaint, unaccompanied by filing, does not fit within the express language of the syllabus to *Sharon Village*, which reads, "The preparation and filing of a complaint with a board of revision on behalf of a taxpayer constitute the practice of law." Were either preparation alone or filing alone sufficient to constitute the practice of law for purposes of determining the validity of a valuation complaint, the syllabus would have read, "The preparation *or* filing of a complaint with a board of revision on behalf of a taxpayer constitutes the practice of law."

In any event, the critical inquiry for purposes of determining the vesting of jurisdiction in a board of revision is whether the record demonstrates the initiation of proceedings by the filing of a jurisdictionally valid complaint, *i.e.*, a complaint "prepared and filed" either by the taxpayer acting in a *pro se* capacity or by an attorney authorized to practice law acting in the taxpayer's behalf. See *C.I.A. Properties*, 89 Ohio St.3d at 365, 731 N.E.2d at 683.

Higginbothan conceded that he had drafted and verified the real property assessment complaint before forwarding it to legal counsel. When Klaine signed the complaint in the form "Franklin A. Klaine, Jr., Attorney for Mirge Corp.," he indicated his assent to the characterization found within it that he was Mirge's representative, irrespective of the identity of the person or persons who had prepared the document. Cf. Civ.R. 11 ("The signature of an attorney * * * constitutes a certificate by the attorney * * * that the attorney * * * has read the document; that to the best of the attorney's * * * knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay"). When an attorney affixes his or her signature to such a complaint in his or her capacity as an attorney and directs that it be filed, that attorney thereby indicates his or her undertaking of legal representation of the taxpayer.

Accordingly, it was Klaine, rather than Higginbothan, who initiated the board of revision proceedings by "preparing and filing" the complaint.

Moreover, as observed by the Board of Tax Appeals, it is commonplace for nonattorneys to assist in the drafting of complaints and in providing factual information for inclusion in complaints. Ultimately, however, the attorney ratifies and assumes responsibility for a complaint by signing and filing it, whether or not he acted as its scrivener.

We therefore hold that an attorney who signs an R.C. 5715.19 valuation complaint in his or her capacity as an attorney-at-law and files it, or directs its filing, in accord with R.C. Chapter 5715, has thereby "prepared and filed" that complaint for purposes of determining whether jurisdiction has vested in a county board of revision, as contemplated by *Sharon Village Ltd. v. Licking Cty. Bd. of Revision* (1997), 78 Ohio St.3d 479, 678 N.E.2d 932.

The board of revision and the Board of Tax Appeals did not err in finding that jurisdiction had vested in the board of revision as a result of the filing of the 1999 complaint by, or at the direction of, attorney Klaine, who had signed the complaint, even though it may have been drafted and verified before a notary public by nonattorney Higginbothan. It is therefore unnecessary for us to consider the constitutionality of that part of R.C. 5715.19 that purports to empower certain nonattorneys, including corporate officers, to file valuation complaints on behalf of others.

## II

### *Retroactivity Issue*

The board of education contends that application of Sub.H.B. No. 694 so as to allow Mirge to file a second challenge to the valuation of its property for tax year 1996 violates Section 28, Article II of the Ohio Constitution. That constitutional provision states that "[t]he general assembly shall have no power to pass retroactive laws." Mirge argues that Sub.H.B. No. 694 cured a defect in a prior statute and was, thus, a remedial statute that could be applied retroactively.

We recently interpreted Section 28, Article II of the Ohio Constitution, stating that "[t]he retroactivity clause nullifies those new laws that 'reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time [the statute becomes effective].'" *Bielat v. Bielat* (2000), 87 Ohio St.3d 350, 352–353, 721 N.E.2d 28, 32, quoting *Miller v. Hixson* (1901), 64 Ohio St. 39, 51, 59 N.E. 749, 752. We further distinguished between constitutional and unconstitutional retroactivity, and set forth a two-prong test to determine unconstitutional retroactivity. First, the court must "determine whether the General Assembly expressly intended the statute to apply retroactively," *Bielat* at 353,

721 N.E.2d at 33, citing R.C. 1.48. "If so, the court moves on to the question of whether the statute is substantive, rendering it *unconstitutionally* retroactive, as opposed to merely remedial [*i.e.*, constitutionally retroactive]." (Emphasis *sic.*) *Id.*

Permissively retroactive, remedial laws are laws that "merely substitute a new or more appropriate remedy for the enforcement of an existing right." *State v. Cook* (1998), 83 Ohio St.3d 404, 411, 700 N.E.2d 570, 577. "On the other hand, a retroactive statute is substantive—and therefore *unconstitutionally* retroactive—if it impairs vested rights, affects an accrued substantive right, or imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction." *Bielat, supra,* at 87 Ohio St.3d at 354, 721 N.E.2d at 33.

The *Bielat* court thereby recognized that a statute that retroactively creates a new right is unconstitutionally retroactive if, and only if, it also impairs a vested right or creates some new obligation or burden as well:

"A claim for substantive retroactivity cannot be based solely upon evidence that a statute retrospectively created a new right, but must also include a showing of some impairment, burden, deprivation, or new obligation accompanying that new right." *Bielat,* paragraph two of the syllabus.

The *Bielat* opinion cited *State ex rel. Crotty v. Zangerle* (1938), 133 Ohio St. 532, 11 O.O. 226, 14 N.E.2d 932, in which the court nullified a statute that allowed for the refunding of tax penalties legally paid in prior years. Quoting extensively from *Hamilton Cty. Commrs. v. Rosche Bros.* (1893), 50 Ohio St. 103, 33 N.E. 408, the *Crotty* court concluded that the statute created a new right by providing a new legal avenue to recover penalties, but that it was unconstitutionally retroactive because it imposed an obligation on the county officials to refund taxes " 'that did not attach to the transaction when it occurred.' " *Crotty,* 133 Ohio St. at 536, 11 O.O. at 228, 14 N.E.2d at 934, quoting Rosche, 50 Ohio St. at 113, 33 N.E. at 410.

Here, Sub.H.B. No. 694 similarly purports to create a new right in property owners to refile dismissed complaints under new substantive rules governing the vesting of jurisdiction in a board of revision to reduce real property assessments and creates a new right to file successive valuation complaints in the same triennium under particular circumstances. While the General Assembly may have the right to accomplish such changes, assuming they are otherwise constitutional, the General Assembly may not do so retroactively, as such changes bring with them new burdens and therefore are not merely remedial. The county officials who opposed reduction in assessed valuations when the first complaints were dismissed could have concluded that those dismissals, followed by exhaustion of judicial review, ended the valuation proceedings and established the value of the property for the triennium period, thereby creating a "reasonable expecta-

tion of finality." Cf. *State ex rel. Matz v. Brown* (1988), 37 Ohio St.3d 279, 281, 525 N.E.2d 805, 808. But Sub.H.B. No. 694 imposes on those officials a burden to again defend the value determined by the auditor and, potentially, to refund taxes if the complainant is successful. Under *Bielat* and *Crotty*, Sub.H.B. No. 694 is unconstitutionally retroactive because it creates a new right while, at the same time, imposing a new burden on parties who had appeared in opposition to the merits of once-dismissed valuation complaints or countercomplaints.

We therefore hold that R.C. 5715.19 as amended by Sub.H.B. No. 694 may not be constitutionally applied to permit the refiling of once-dismissed R.C. 5715.19 complaints challenging valuations for tax years prior to the effective date of Sub.H.B. No. 694 (March 30, 1999). Such an application violates Section 28, Article II of the Ohio Constitution, which prohibits the enactment of retroactive legislation.

Accordingly, we reverse the decision of the Board of Tax Appeals and remand the cause with instructions that the valuation of appellant's property for tax years 1996, 1997, and 1998 be set at $227,920, as originally assessed by the auditor.

*Decision reversed*
*and cause remanded.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in paragraph one of the syllabus and in the judgment.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

---

---

*Wood & Lamping, L.L.P.*, and *David C. DiMuzio*, for appellant.

*Strauss & Troy* and *Franklin A. Klaine, Jr.*, for appellee Mirge, Inc.