OPINION
{¶ 1} Shawn Boczar appeals his convictions for Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs and Receiving Stolen Property in the Ashtabula County Court of Common Pleas. For the following reasons, we affirm Boczar's convictions.
 {¶ 2} On August 4, 2006, Boczar was indicted by the Ashtabula County Grand Jury on one count of Illegal Manufacture of Drugs, a felony of the second degree in violation of R.C. 2925.04, two counts of Illegal Assembly or Possession of Chemicals for *Page 2 
the Manufacture of Drugs, felonies of the third degree in violation of R.C. 2925.041, one count of Trafficking in Methamphetamine, a felony of the fourth degree in violation of R.C. 2925.03, one count of Unlawful Possession of Dangerous Ordnance, a felony of the fifth degree in violation of R.C. 2923.17, and one count of Receiving Stolen Property, a felony of the fifth degree in violation of R.C. 2913.51.
 {¶ 3} Boczar pled not guilty and the matter was tried before a jury between December 5 and 7, 2006.
 {¶ 4} The following testimony was proffered at trial. Mike Yankie testified that on April 8, 2006, his 2004 Honda Rubicon (a four-wheeler) was discovered stolen from his father's property on State Route 193 in Sheffield, Ohio.
 {¶ 5} On April 20, 2006, Deputy Sergeant Cary Nelson and Deputy Anthony M. Mino of the Ashtabula Sheriff's Department responded to a report of criminal trespass on Mechanicsville Road. The owner of the property, a Mr. Janson, had found a propane tank in a wooded area at the rear of the property and observed two men fleeing the property on four-wheelers. One of the men was identified as Max Whetson.
 {¶ 6} The tank was described as large, painted black, and had an altered valve marked by bluish discoloration. Mr. Janson was sprayed with the contents of the tank after opening the valve. Thereupon, he dropped the tank and its contents bled out. Sergeant Nelson and Deputy Mino both inspected the tank and concluded it had contained anhydrous ammonia, an ingredient in the manufacture of methamphetamine. Mino testified there was a residual amount of ammonia left in the tank. Mino and Nelson testified the "bluing" around the valve was also evidence that the tank had contained ammonia. Finally, Mino testified it is common for producers of methamphetamine to use propane tanks in altered condition to store anhydrous *Page 3 
ammonia. It is an increasingly "common practice" for producers in Ashtabula County to hide tanks in rural areas and on farm property. The tanks are often altered so that hoses can be attached to facilitate the transfer of anhydrous ammonia and because brass fittings are quickly deteriorated by ammonia.
 {¶ 7} Sergeant Nelson and Deputy Mino next proceeded to the residence of James Lemieux at 3911 Woodside Drive, about two miles from where the tank was discovered, and where the Deputies had reason to believe Max Whetson could be found.
 {¶ 8} Whetson was found and arrested at the Woodside Drive property. Also at the residence at this time were Lemieux, Boczar, and Boczar's girlfriend, Courtney Sposito.
 {¶ 9} Deputies found a four-wheeler outside the residence, which Boczar claimed was his. The engine was warm, one of the tires was flat, and the vehicle was muddy. The ignition was stripped from the vehicle and a "toggle switch" installed so that it could be started without a key. The VIN had been removed. The four-wheeler could be identified as Yankie's, however, based on the engine number. Deputy Mino testified the value of the four-wheeler was between $500 and $5000 based on the claim paid by Yankie's insurer. Boczar testified he paid $700 for the four-wheeler, about a week earlier, to a woman from Pierpont, Ohio. Boczar also testified that he had "an idea" the four-wheeler might be stolen.
 {¶ 10} Sergeant Nelson and Deputy Mino testified there was a chemical ("anhydrous") odor, similar to the odor of a methamphetamine laboratory, coming from the residence. The Deputies searched the residence and discovered the following items. In the living room, they found a cold wood-burning stove containing partially *Page 4 
burnt lithium strips, rubber gloves, and paper towels with a bluish discoloration; a Rubbermaid container holding plastic tubing and timers; and a safe containing a small explosive device[1], ninety-six pseudoephedrine pills in blister packs, a glass pipe with methamphetamine residue, digital scales with methamphetamine residue, a spoon and "tutors" (straws for snorting methamphetamine) with methamphetamine residue, snow seal bags, and a small amount of methamphetamine.
 {¶ 11} Deputy Mino testified how each of these items could be used for the manufacturing, packaging, and consumption of methamphetamine.
 {¶ 12} In a bedroom, deputies found a plastic milk jug containing a reddish liquid separated into two levels, the upper level being more translucent and the lower level more opaque. Mino testified the jug was being used to "break down" ephedrine pills, i.e. extract the ephedrine to produce methamphetamine. Mino testified the pills are dissolved in a solvent agent, in this case Coleman fuel; the solid waste (or "binders") sink to the bottom of the container and the ephedrine is contained in the clearer liquid floating at the top.[2]
 {¶ 13} In a downstairs bedroom, deputies found a police scanner and a foil packet of methamphetamine. Deputies also found clothes, which they testified belonged to Boczar and Sposito.
 {¶ 14} In the kitchen, deputies found coffee filters with bluish stains, a funnel, pliers and wire snips, a stripped lithium battery, and two containers of salt. Deputy Mino *Page 5 
testified how each of these items could be used for the manufacturing of methamphetamine.
 {¶ 15} Boczar was arrested after the search.
 {¶ 16} A few days after his arrest, Boczar spoke with Deputy Mino. According to Mino, Boczar said he and Sposito had been staying with Lemieux for two to three months because he had nowhere else to stay; although, at the time of the arrest, Boczar claimed he was staying on Foreman Road. According to Mino, Boczar admitted to using and selling methamphetamine. Boczar also admitted to purchasing pills and lithium batteries to make methamphetamine, but denied being involved in the actual production of methamphetamine.
 {¶ 17} According to Mino, Boczar said that, on April 20, 2006, he had gone with Whetson to pick up the tank on the Mechanicsville Road property, but fled when they were seen by the property owner. While fleeing, Whetson's four-wheeler went off an embankment into a creek and was abandoned. Boczar carried Whetson back to Lemieux' residence on his four-wheeler.
 {¶ 18} Deputy Mino further testified that Boczar admitted the safe, the CO[2] bomb, the glass pipe, and the pseudoephedrine pills were his, although the pseudoephedrine was used for allergies.
 {¶ 19} At trial, Boczar and Sposito testified they never lived with Lemieux, but stayed with Sposito's mother on Foreman Road. Boczar had gone regularly to Lemieux' for two to three months, however, to work on cars.
 {¶ 20} At trial, Boczar admitted using methamphetamine at the time of his arrest. Boczar also testified to being a "shopper" of pseudoephedrine pills for Whetson and to selling methamphetamine, but that it had been years since he had done these things. *Page 6 
 {¶ 21} At trial, Boczar admitted the safe and the CO[2]
bomb were his. Boczar testified that he had given the safe to Whetson and, except for the bomb, the contents of the safe belonged to Whetson. Boczar said he suspected that Whetson manufactured methamphetamine, but that he had never seen it being manufactured. Boczar testified that when he told Mino the pills were his, he was referring to pseudoephedrine pills in Sposito's car which he had for his allergies.
 {¶ 22} Boczar denied going with Whetson to get the anhydrous tank on Mechanicsville Road. Instead, Boczar testified he had gone to visit a friend and found Whetson after Whetson had wrecked his four-wheeler.
 {¶ 23} The jury found Boczar guilty of Receiving Stolen Property and Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs.
 {¶ 24} On February 27, 2007, the sentencing hearing was held. Boczar was sentenced to a two-year term of imprisonment for Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs and a one-year term of imprisonment for Receiving Stolen Property, to be served concurrently for a total term of incarceration of two years.
 {¶ 25} Boczar timely appeals and raises the following assignments of error:
 {¶ 26} "[1.] There was insufficient evidence presented to sustain a conviction for the charge of receiving stolen property in violation of defendant-appellant's Fifth, Sixth, and Fourteenth Amendment rights.
 {¶ 27} "[2.] The trial court abused its discretion by permitting the State to use the defendant-appellant's prior conviction non disclosed in discovery to impeach defendant in violation of his Fifth, Sixth, and Fourteenth Amendment Rights. *Page 7 
 {¶ 28} "[3.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence in violation of Article IV of the Ohio Constitution.
 {¶ 29} "[4.] Trial counsel's deficient performance during the trial deprived the defendant-appellant of the effective assistance of counsel in violation of his Sixth and Fourteenth Amendment Rights."
 {¶ 30} The Ohio Rules of Criminal Procedure provide that a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Crim.R. 29(A). "`[Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury," i.e. "whether the evidence is legally sufficient to support the jury verdict as a matter of law."State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, quoting Black's Law Dictionary (6 Ed.1990), 1433. Essentially, "sufficiency is a test of adequacy," that challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. Id.
 {¶ 31} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979),443 U.S. 307, 319. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the *Page 8 
crime proven beyond a reasonable doubt." Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 32} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence."Thompkins, 78 Ohio St.3d at 387 (emphasis sic) (citation omitted). Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support the verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, at ¶ 25 (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" Id.
 {¶ 33} Generally, the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine. State v. Thomas (1982), 70 Ohio St.2d 79, at the syllabus. When reviewing a manifest weight challenge, however, the appellate court sits as the "thirteenth juror." Thompkins, 78 Ohio St.3d at 387
(citation omitted). The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id., quoting Martin,20 Ohio App.3d at 175.
 {¶ 34} In the first assignment of error, Boczar maintains that there was insufficient evidence to convict him of Receiving Stolen Property. *Page 9 
 {¶ 35} In order to convict Boczar of fifth-degree Receiving Stolen Property, the State had to prove, beyond a reasonable doubt, that Boczar had "receive[d], retain[ed], or dispose[d] of property of another knowing or having reasonable cause to believe that the property ha[d] been obtained through commission of a theft offense" and that "the value of the property involved is five hundred dollars or more and is less than five thousand dollars." R.C. 2913.51(A) and (C).
 {¶ 36} Boczar argues the State failed to introduce competent evidence that the value of Yankie's four-wheeler was between $500 and $5,000. Boczar claims the only evidence of the value of the four-wheeler was Deputy Mino's testimony that the insurance company paid between $500 and $5,000 on Yankie's claim for the stolen four-wheeler. This testimony, arguably, constitutes inadmissible hearsay and, thus, cannot be used to determine the value of the four-wheeler. Cf. State v. Reese,165 Ohio App.3d 21, 2005-Ohio-7075, at ¶ 2, ¶¶ 17-19, and ¶ 28 (testimony from the victim that, "a lot of years ago," her mother told her that her father had paid $3,500 for a ring constituted inadmissible hearsay and was insufficient to determine the value of the ring).
 {¶ 37} We disagree that Deputy Mino's testimony was the only testimony regarding the value of the four-wheeler. Boczar testified that he paid $700 for the four-wheeler about a week before his arrest. This is competent evidence of the value of the four-wheeler. Cf. R.C.2913.61(D)(3) (the "fair market value" of personal property, defined as "the money consideration that a buyer would give and a seller would accept for property or services, assuming that the buyer is willing to buy and the seller is willing to sell," shall be used to determine the value of property involved in a theft offense).
 {¶ 38} The first assignment of error is without merit. *Page 10 
 {¶ 39} In his third assignment of error, Boczar asserts that his conviction for Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs is against the manifest weight of the evidence.
 {¶ 40} In order to convict Boczar of Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, the State had to prove, beyond a reasonable doubt, that Boczar knowingly "assemble[d] or possessed] one or more chemicals that may be used to manufacture a controlled substance," i.e. methamphetamine. R.C. 2925.041(A). "The assembly or possession of a single chemical that may be used in the manufacture of a controlled substance * * *, with the intent to manufacture a controlled substance * * * , is sufficient to violate this section." R.C. 2925.041
(B).
 {¶ 41} Specifically, Boczar argues there is no credible evidence that he provided pseudoephedrine pills or lithium batteries for the manufacture of methamphetamine during the period of time charged in the indictment, i.e. between February 1, 2006, and April 20, 2006. Neither Boczar's trial testimony nor Deputy Mino's account of his interview with Boczar contain an admission from Boczar that he provided pseudoephedrine pills and/or lithium batteries during this time.
 {¶ 42} Boczar further argues that there was no evidence linking him to the lithium batteries found at Lemieux' residence.
 {¶ 43} Finally, Boczar argues that Deputy Mino's testimony indicating that Boczar was living at Lemieux' residence and owned the pseudoephedrine pills found in the safe was not credible. Boczar explained at trial that he was referring to allergy medicine in Sposito's car when Mino asked him if the pills were his. Boczar testified at the time of his arrest and at trial that he did not live at Lemieux's, but was only working there. Boczar's testimony as to his residence on Foreman Road was supported by Sposito's *Page 11 
testimony. Thus, the evidence linking Boczar to the pills found in the safe is not credible.
 {¶ 44} Contrary to Boczar's arguments, there was credible evidence before the jury that Boczar knowingly possessed chemicals that may be used in the production of methamphetamine. Boczar's conviction is supported by evidence demonstrating his constructive possession of the pseudoephedrine pills in the safe.
 {¶ 45} Deputy Mino testified that Boczar admitted that he owned the pills and the safe. The issue of whether Boczar was actually living at Lemieux' residence is not crucial. Boczar admitted he was regularly at Lemieux' for two to three months prior to his arrest. Boczar testified Whetson lived at Lemieux' and he believed that Whetson manufactured methamphetamine. Boczar admitted that he was addicted to methamphetamine, obtained it from Whetson, and often ingested it at Lemieux'. Boczar admitted that he purchased the safe and that at least one item within it, the CO[2] bomb, was his. Regardless of whether Boczar was living at Lemieux', Boczar's connections with the residence were significant enough to support the inference, consistent with Mino's testimony, that property, such as the safe and the pseudoephedrine pills, belonged to or were provided by Boczar. Cf.State v. David, 11th Dist. No. 2005-L-109, 2006-Ohio-3772, at ¶ 27
("[t]he fact that [defendant] had an admitted methamphetamine habit makes it more likely that he possessed the methamphetamine found in his vehicle").
 {¶ 46} The third assignment of error is without merit.
 {¶ 47} In the second assignment of error, Boczar asserts the trial court erred by allowing the State to impeach him with evidence of a prior conviction for misdemeanor Falsification which had not been disclosed to Boczar prior to trial. *Page 12 
 {¶ 48} Following Boczar's direct testimony, the State advised the court that it wished to impeach Boczar with a prior conviction for Falsification. Asked whether the State had given notice to Boczar during discovery, the prosecutor replied that the State had just discovered the conviction "today" and believed that it was only under a duty to advise the defendant of prior felony convictions. Over the opposition of defense counsel, the court allowed the State to impeach. On cross-examination, the prosecutor asked Boczar, "you actually have a prior conviction for Falsification, don't you." Boczar replied that he did.
 {¶ 49} Ohio Criminal 16 provides: "Upon motion of the defendant the court shall order the prosecuting attorney to furnish defendant a copy of defendant's prior criminal record, which is available to or within the possession, custody or control of the state." Crim.R. 16(B)(1)(b). Boczar duly requested copies of his prior record in a Request for Discovery filed on August 15, 2006. Thus, the trial court erred by allowing the State to impeach Boczar with his prior conviction.
 {¶ 50} Error in the admission of evidence is harmless if there is no reasonable possibility that exclusion of the evidence would have affected the result of this trial. State v. Webb, 70 Ohio St.3d 325,335, ("nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict") (citations omitted); State v.Werfel, 11th Dist. Nos. 2002-L-101 and 2002-L-102, 2003-Ohio-6958, at ¶ 43 ("In order to determine whether the admission of testimony on the prior convictions is prejudicial, we must evaluate the relationship between that evidence and the totality of other evidence properly introduced by the prosecution at trial. * * * If there is other *Page 13 
overwhelming evidence of guilt, the admission of the testimony regarding the facts of the past convictions will be deemed harmless error.") (citation omitted).[3]
 {¶ 51} In the present case, the error of allowing the State to ask Boczar about a prior conviction for Falsification was harmless beyond a reasonable doubt. The impeachment consisted of a single question, with no explanation of what the crime of Falsification entails generally or of the circumstances of Boczar's conviction in particular. The prior conviction did not relate to any element of the crimes with which Boczar was charged, but was merely meant to impeach his credibility. Notwithstanding the improper admission of this testimony, the jury did find Boczar a credible witness, inasmuch as he was acquitted of four of the charges against him. As to the charges for which Boczar was convicted, there was strong evidence to support them. The stolen four-wheeler Boczar purchased had been visibly "hot-wired" and Boczar admitted he suspected it of having been stolen. The pseudoephedrine pills were found in the safe which Boczar admitted to purchasing and storing items in, and to which he had access.
 {¶ 52} Additionally, Boczar did receive notice of the conviction for Falsification, albeit outside of the State's response to his discovery request. On April 18, the State filed a Motion to Revoke Bond and Memorandum in Support which contained a record of Boczar's prior convictions, including the conviction for Falsification in Case No. 2006 CR B 00301. Based upon the fact that Boczar's prior conviction was in the trial court's record and had been served on defense counsel, Boczar cannot claim to have been unaware of the prior conviction. *Page 14 
 {¶ 53} The second assignment of error is without merit.
 {¶ 54} Under the fourth and final assignment of error, Boczar asserts that he received ineffective assistance from trial counsel, in that trial counsel failed to object to a significant number of inadmissible hearsay statements. Boczar claims that trial counsel's deficient performance had the effect of denying him the right to confront these absent witnesses, whose testimony was nonetheless put before the jury.
 {¶ 55} The Ohio Supreme Court has adopted a two-part test to determine whether an attorney's performance has fallen below the constitutional standard for effective assistance. To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal, 87 Ohio St.3d 378, 388-389,2000-Ohio-448, citing Strickland v. Washington (1984), 466 U.S. 668,687-688. The failure to prove any one prong of this two-part test makes it unnecessary for a court to consider the other prong.Madrigal, 87 Ohio St.3d at 389, citing Strickland, 466 U.S. at 697.
 {¶ 56} Several of the allegedly improper statements identified by Boczar do not constitute hearsay, but merely explain how the investigation of trespass on Mechanicsville Road led sheriff's deputies to Lemieux' residence and, subsequently, to Boczar's arrest.
 {¶ 57} The Ohio Supreme Court has held that testimony is not hearsay, when it "explains the actions of a witness to whom a statement was directed, such as to explain the witness' activities"; "if an out-of-court statement is offered to prove a statement was made and not for its truth"; "to show a state of mind"; and "to explain an act in question." *Page 15 State v. Maurer (1984), 15 Ohio St.3d 239, 262 (citations omitted). Accordingly, testimony offered to explain an individual or an agency's motivation for investigating a matter has not been considered hearsay and/or inadmissible. See State v. Thomas (1980), 61 Ohio St.2d 223, 232
("[t]he testimony at issue was offered to explain the subsequent investigative activities of the witnesses" and "was not offered to prove the truth of the matter asserted").
 {¶ 58} These statements include: Yankie's testimony that his father informed him the Honda four-wheeler had been stolen; Sergeant Nelson and Deputy Mino's testimony that Mr. Janson saw two white males riding four-wheelers, recognized one of them as Whetson, and was sprayed with the contents of the anhydrous ammonia tank; and Deputy Mino's testimony regarding statements made by Lemieux.
 {¶ 59} Similarly, Mino testified that during his investigation at Lemieux' residence, a man named Erb, whom Boczar had allegedly sold methamphetamine to in the past, drove onto the property looking for Boczar. It is uncertain why this testimony should constitute hearsay, particularly when Boczar was acquitted of the charge of Trafficking.
 {¶ 60} Several of the allegedly improper statements do constitute hearsay, but had no prejudicial effect because the truth of the statements was confirmed by other evidence. Nelson testified the first deputy on the scene said the tank contained anhydrous ammonia, but this fact was confirmed by Nelson and Mino's investigation of the tank. Mino testified Whetson told him where he had crashed the four-wheeler, but this fact was confirmed by Boczar's own testimony and by the actual recovery of the four-wheeler.
 {¶ 61} Another hearsay statement without prejudicial effect is Nelson's statement that Lemieux told him Whetson did not stay at his residence. This statement, neither *Page 16 
confirmed nor disproved by other evidence, simply had little relevance to the charges against Boczar.
 {¶ 62} Boczar identifies several statements as constituting improper speculation or misrepresentation of the evidence presented. Deputy Mino testified at length as to the ways methamphetamine is produced, how the ingredients are obtained and handled, how it is ingested, and how it is sold. Mino was competent to testify on these matters based on his personal training and experiences. State v. McKee, 91 Ohio St.3d 292,296-297, 2001-Ohio-41 ("courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified * * * based upon a lay person's personal knowledge and experience"). This testimony was also necessary to interpret the significance of the objects found at Lemieux' residence. Accordingly, it was not improper.
 {¶ 63} Sergeant Nelson opined that the reason for the police scanner at Lemieux' residence was that "Meth users normally like to know what we are doing." Unlike Mino, Nelson did not establish any foundation for knowledge of the habits of methamphetamine users. However, the failure to object to Nelson's statement is harmless since Boczar was not charged in connection with the police scanner and the scanner was not probative of the charges for which Boczar was convicted.
 {¶ 64} Finally, Boczar claims a number of statements identifying him as being on Janson's property were improper. Nelson testified that he "believe[d]" Whetson and Boczar were the two males seen riding four-wheelers on Janson's property. Mino testified, without foundation, that Boczar was seen in the area where the anhydrous ammonia tank was found. The prosecutor argued in closing that Boczar's admission to Mino of having been on Janson's property with Whetson was "consistent with all of the *Page 17 
witnesses who saw two white males." Without passing on the propriety or impropriety of these statements, their effect was not prejudicial inasmuch as Boczar was acquitted of the charges connected to the anhydrous ammonia tank found on Janson's property.
 {¶ 65} For the foregoing reasons, the statements Boczar claims trial counsel was ineffective for not objecting to were neither improper nor prejudicial. The fourth assignment of error is without merit.
 {¶ 66} The judgment of the Ashtabula County Court of Common Pleas, finding Boczar guilty of Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs and Receiving Stolen Property, is affirmed.
TIMOTHY P. CANNON, J., concurs, COLLEEN MARY OTOOLE, J., dissents with a Dissenting Opinion.
[1] Mino testified the device, known as a "cricket," was a CO[2] cartridge filled with powder and having a wick attached.
[2] Mino's opinion that the solvent was Coleman fuel was based on the PH of the liquid in the milk jug and a Coleman fuel can found in the same bedroom. A bottle of Liquid Fire was also found in the bedroom, and Mino testified that Liquid Fire is also used as a solvent.
[3] The State urges us to apply the abuse of discretion standard appropriate to the review of sanctions for Crim.R. 16 violations.State v. Parson (1983), 6 Ohio St.3d 442, 445. In the present case, however, the trial court did not acknowledge violation of discovery and, therefore, did not impose any sanction. Boczar's objection was overruled on the grounds that the prior conviction "was a misdemeanor and it has to do with this defendant."