[Cite as *State v. Donlow*, 2021-Ohio-3019.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BRIAN DONLOW, JR.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0049**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 377A.

**BEFORE:**
Carol Ann Robb, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains,* Mahoning County Prosecutor, *Atty. Ralph M. Rivera,* Assistant Chief, Criminal Division, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee and

*Atty. Edward Czopur,* DeGenova & Yarwood, Ltd., 42 North Phelps Street, Youngstown, Ohio 44503 for Defendanrt-Appellant.

Dated:  August 30, 2021

---

**Robb, J.**

{¶1}    Defendant-Appellant Brian Donlow Jr. appeals after being convicted by a jury in the Mahoning County Common Pleas Court of murder with a firearm specification and having a weapon while under disability.  He raises issues with sufficiency of the evidence, weight of the evidence, the admissibility of a detective's testimony identifying him from a surveillance video recorded at the scene of the shooting, the admissibility of alleged hearsay where two detectives each testified about a different tip providing the names of the suspects, and cumulative error regarding the two tips.  For the following reasons, Appellant's convictions are affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2}    On June 18, 2018, just after midnight, Brandon Wylie was shot multiple times on the grounds of the Plazaview Apartments in Youngstown.  His body rested face up in the grass under a surveillance camera mounted on a pole.  Two females told the first-responding officer they were at their car when they saw two males with handguns, heard the shots, and then saw the two males run toward the entrance of the apartment complex at McGuffey Road.  (Tr. 492).

{¶3}    The police reviewed video from multiple cameras at the apartment complex. The victim arrived at the street entrance to the apartment complex on foot at 11:52 p.m. on the video which was approximately ten minutes behind real time.  (Tr. 730).  He walked north on Plazaview Court.  At the same time, a small gathering could be seen outside of Building L.  At 11:54, the victim turned into the parking lot of Building L.  At the same time, two males from the gathering approached the victim's location in the parking lot.   After viewing video collected from multiple cameras, a detective identified Stephone Hopkins as the one wearing a white shirt and dark shorts with a large logo covering much of the left leg and identified Appellant as the one wearing a darker shirt (blue or gray).  A female remained near a car in front of the building, and a different male in a white shirt can be seen with her.

{¶4}    Within a minute, the victim walked back the way he came with Hopkins as Appellant trailed behind them.  As they turned the corner from the parking lot and walked

south onto Plazaview Court, they passed close by the camera facing the office at 11:55 (from the time marks of 18 to 36 seconds).

**{¶5}** After they reached the playground area, the video from the pole camera above the victim's body (and east of the road) shows the person identified as Hopkins enter the scene shooting at 11:55 (at the 48 second mark). He was facing the location of the camera and walking south up the street while firing multiple times with his left hand toward the side of the road where the victim's body was found. (Tr. 736). The victim was out of the camera viewing area (to the north of and under the camera's range).

**{¶6}** As Hopkins stopped firing, the person identified as Appellant ran into the frame toward Hopkins from the north. He had a black object in his hand. Appellant approached the area where the victim's body was found. Hopkins walked toward Appellant, and they then began walking south down the sidewalk together. After an approaching car passed, they ran toward the complex exit, turned east at McGuffey Road at 11:56, and ran along the front of the complex. (Tr. 738).

**{¶7}** Immediately after the first shot was captured on one camera, a different camera showed the female in front of Building L flee into the apartment while two individuals in white T-shirts in front of Building L ran the opposite direction from the location of the shooting and cut north between Building L and another building. A different camera with a back view of Building L showed these two individuals continuing to run in the opposite direction as the individuals identified as Appellant and Hopkins. (Tr. 739-740). At 11:58, these two individuals walked south past the office toward the playground. A detective identified them as Lorice Moore and Chasmar Ford. Moore approached the victim's location under camera and turned away with both hands on his head as if in distress. They walked up Plazaview Court and were picked up by a vehicle at midnight before they reached McGuffey Road.

**{¶8}** The police found fourteen shell casings in two distinct areas on the roadway of Plazaview Court. (Tr. 607); (St.Ex. 36). In the northern location, they found eight 9mm shell casings, which testing showed were all fired from the same firearm. (Tr. 676). This location was near where the victim's .32 caliber revolver and cigarettes were found in the roadway (north of the victim's final resting place). In the southern location, more parallel

to the victim's body, they found six .45 caliber shell casings, which testing showed were fired from the same firearm. (Tr. 677).

{¶9} The victim suffered nine gunshot wounds with the following entry points and paths: (1) right clavicle, upper lung; (2) center chest, through the heart and fatal within seconds; (3) lower right abdomen, from right to left; (4) abdomen, left to right and up, lodging in fat by the colon; (5) skin of abdomen pierced by fragment without penetrating into abdomen; (6) lower left abdomen, lethal wound hitting the largest vessel in the body near the bowel; (7) back of thigh, lodging in the body after an upward path from right to left; (8) right knee at a downward path, passing behind the kneecap; and (9) left inner lower leg, passing straight through with no angle. (Tr. 530-545). There was bruising at the exit wound of the shot through the heart, which can occur when a victim's body is pressed against a hard object, such as the ground. (Tr. 532-533). The two slugs, recovered from the abdomen and thigh, were more likely 9mm (than .45 caliber) bullets. (Tr. 680).

{¶10} The police recovered the victim's .32 caliber revolver which contained three live .32 caliber rounds, which were in position to be fired next, and no empty casings in the other three spots in the chamber, indicating the victim fired no shots (as a revolver does not eject its casings). (Tr. 623, 654, 869). Also, testing showed none of the recovered casings or slugs were fired by the revolver. (Tr. 679).

{¶11} The victim's wallet and phone were found in his pocket, and he had blister packs of Tramadol (an opioid) in his sock. (Tr. 620, 626-627). The victim's phone showed he communicated with Lorice Moore a few times that evening. There were phone calls, and then, at 11:27 p.m., the victim texted, "Tell dude I had to go somewhere." (Tr. 707, 784, 801).

{¶12} On May 16, 2019, Appellant was indicted for aggravated murder (prior calculation and design), an alternative count of murder (purposely causing the death), a firearm specification, and having a weapon while under disability. Co-defendant Stephon Hopkins was similarly charged. The case was jointly tried to a jury.

{¶13} The victim's father testified the victim helped him move an appliance from a relative's house on June 18, 2018 and they did not get home until nearly 11:00 p.m. The

Plazaview apartment complex was a quarter of a mile from their house. The victim's father did not know the defendants. (Tr. 416-422).

{¶14} Witness A testified she was spending time outside of the apartment of her female friend on June 18, 2018. Another female friend, Witness B, was there as well. Witness A named the four males who arrived later: Lorice Moore, Chasmar Ford, Stephon Hopkins, and Appellant Brian Donlow. (Tr. 452). Witness A said she took orders from each person for drinks and snacks and drove to a convenience store, bringing Witness B with her. (Tr. 454). She identified Appellant and Hopkins at trial and said they were at the gathering when she left just minutes before the shooting. (Tr. 457). The victim had not arrived when she left. (Tr. 456).

{¶15} Approximately ten minutes later, while driving back from the store, Witness A picked up Moore and Ford on McGuffey Road in front of the apartment complex and dropped them off a few blocks away near the housing development of Victory Estates. (Tr. 455-456, 462-463). She called the police the next day to report who was at the gathering in front of Building L, but she did not specifically provide the names Hopkins and Donlow. (Tr. 821-822). She was a friend of Moore and Ford and knew Hopkins as Chip. (Tr. 460, 474). She did not know Appellant's name until she heard it on the news. (Tr. 466).

{¶16} Witness B confirmed the gathering outside of the friend's apartment at Building L of Plazaview Apartments where four males were present: Moore, Ford, Hopkins, and one other male. She had attended school with Moore and Ford and was pregnant with Moore's child at the time. (Tr. 439-440, 862). Hopkins was wearing a white T-shirt and had "a little afro." (Tr. 432). She said she did not see the fourth person's face but said he arrived with the other males who knew him. (Tr. 426-427).

{¶17} Witness B said while she was at the store with Witness A, the female friend they were visiting called and said not to come back to the apartment complex. (Tr. 428). Witness B confirmed they collected Moore and Ford at the corner of McGuffey Road and Plazaview Court and dropped them off at the corner by Victory Estates; she testified they told her somebody had been killed. (Tr. 429).

{¶18} Witness B denied naming Brian Donlow to the detective but acknowledged identifying him from a photograph. (Tr. 431). On cross-examination, she said she told

the detective she did not see Brian Donlow at the gathering, but she also said she looked at pictures of "multiple Brian Donlows" as there were multiple brothers with the name Brian Donlow. (Tr. 447-448). She then said she did not recall identifying a photograph of Brian Donlow and responded in the negative when asked if she saw Brian Donlow at the gathering. (Tr. 448).

{¶19} Detective Zubal testified about viewing photographs posted by Hopkins on Facebook. He said Hopkins was wearing Nike shorts which matched those worn by the shooter in the video. (Tr. 757).

{¶20} Detective Bobovnyik said the shooter was wearing a white T-shirt and shorts with an unusual look, matching those worn by Hopkins in his Facebook post. (Tr. 815, 828). He said Hopkins appeared to be left-handed just like the shooter in the white T-shirt. (Tr. 829). He observed Appellant and Hopkins had similar characteristics with the individuals in the surveillance video from the scene of the shooting, while Moore and Ford did not. (Tr. 827). He said Witness B identified Appellant as being present at the party. (Tr. 825-826).

{¶21} Detective Lambert was not assigned to the case but watched the surveillance video. He testified he was familiar with the four males reported to be at the gathering before the victim arrived. (Tr. 785-796). He identified Hopkins as the person in the white T-shirt seen firing a gun. (Tr. 795-796). He identified Appellant as the individual who followed behind the victim in one video and who approached the body after Hopkins stopped shooting as captured in the video from the camera above the body. (Tr. 797). Detective Lambert said Moore and Ford did not look like the two suspects; Moore is muscular, lean, and older, and Ford is shorter, stockier, and darker with sideburns and a beard. (Tr. 796-799). Photographs of the four men were introduced. (Tr. 805-806, 874-875).

{¶22} The sister of Hopkins testified as an alibi witness. She said Hopkins was at home with her on the night of the shooting and did not leave their home, stating she was awake until 3:00 a.m. (Tr. 912, 918). She added that Appellant, who was a family member, was present at her house as well. (Tr. 912, 931).

{¶23} Appellant's sister also testified as an alibi witness. She said Appellant was at her apartment watching television with her on the night of the shooting. She said she

went to bed before midnight but woke up to check the windows at 12:30, and Appellant was still asleep on her couch. (Tr. 949-954).

**{¶24}** The jury found Appellant and Hopkins not guilty of aggravated murder but guilty of murder with a firearm specification. The court found each defendant guilty of having a weapon while under disability; they both waived a jury on this offense. The court sentenced Appellant to fifteen years to life for murder plus three years for the firearm specification and a consecutive three-year sentence for the offense of having a weapon while under disability, for a total sentence of twenty-one years to life in prison. Appellant filed a timely notice of appeal from the April 22, 2020 sentencing entry.

A/E 1: SUFFICIENCY OF THE EVIDENCE

**{¶25}** Appellant's first assignment of error contends:

"Appellant's convictions were based on insufficient evidence as the state did not produce any evidence that Appellant ever held and/or fired a gun, and/or that he was in any way complicit with the murder of Brandon Wylie."

**{¶26}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution to ascertain whether any rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). The rational inferences to be drawn from the evidence are also evaluated in the light most favorable to the state. *See State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). For a sufficiency review, the question is merely whether "any" rational juror could have found the contested element satisfied beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶27}** An evaluation of witness credibility is not involved in a sufficiency review as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at

390 (Cook, J., concurring). If the court finds insufficient evidence supported the conviction, then a retrial is barred. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 16-20. Yet, even evidence erroneously admitted by the trial court can be considered in the sufficiency evaluation because the remedy for the erroneous admission of prejudicial evidence is a new trial. *See id.*

**{¶28}** Appellant was convicted of murder, which has the elements of purposely causing the victim's death. R.C. 2903.02(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶29}** The specific intent to cause death "may be presumed where the natural and probable consequence of the wrongful act done is to produce death." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 53. "The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be." *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998) (aider and abettor's purpose to kill can be inferred where felony participants had common design and he knew dangerous weapon would be employed or knew the manner of accomplishment was reasonably likely to produce death).

**{¶30}** A person who is complicit can be prosecuted and punished as if he were a principal offender, even if the charge is stated in terms of the principal offense. R.C. 2923.03(F). A person is complicit if, acting with the kind of culpability required for the commission of an offense, he aids or abets another in committing the offense. R.C. 2923.03(A)(2) (with other options including soliciting or procuring another to commit the offense). Aiding and abetting exists where the evidence shows "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001) (finding the appellate court's reversal misapplied the principal that mere presence is not enough, which is meant to

protect bystanders). *See also State v. Trees*h, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001) (the surrounding facts and circumstances are the traditional indicators of a defendant's intent and can be used to demonstrate whether the defendant shared the intent of the principal).

**{¶31}** Appellant believes the state's complicity theory and prior calculation and design theory were inextricably intertwined as the state theorized the suspects escorted the victim from the gathering with a joint plan to kill him. Appellant claims when this theory was defeated by the jury's not guilty verdict on aggravated murder, the complicity theory fell apart. He contends the state failed to show he performed an act of aiding and abetting when the spur of the moment shooting occurred, insisting no evidence shows there was more than one shooter. He emphasizes only one suspect can be seen shooting in the video and this individual was identified as Hopkins. He argues a person seen on video walking into the scene after the shooting is not complicit by his mere presence. As he claims there was no evidence he had a firearm, he also contests his conviction for having a weapon while under disability.

**{¶32}** However, the state presented evidence from which some rational juror could find Hopkins was not the only shooter and Appellant was the other shooter. The four males at the gathering before the victim arrived were identified. From the communications between one of the males (Moore) and the victim, it could be gleaned they were expecting the victim's arrival. From the content of a text, it seemed an individual the victim did not know well was becoming impatient. The victim and Moore knew each other as they spoke on the phone and texted, and Hopkins was a friend of the victim on Facebook.

**{¶33}** The video showed the victim leaving the vicinity of the gathering with individuals identified as Hopkins and Appellant. Appellant and Hopkins were related. As they walked around a corner, Hopkins led the way while Appellant followed behind the victim. Within seconds, a person identified as Hopkins can be seen on another video firing a gun towards the victim's position. A person identified as Appellant can be seen approaching the position of Hopkins as he finished shooting as if they were part of a trusting team and then approaching the area of the victim's body (at which point the video does not show what he was doing as the victim was beneath the camera). Appellant and

Case No. 20 MA 0049

Hopkins then fled the scene on foot together. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Johnson*, 93 Ohio St.3d at 245.

{¶34} Furthermore, there was strong evidence of two shooters. The evidence indicated the victim fired no shots: his double action .32 caliber revolver had three live rounds in the firing position, contained no fired shell casings in the chambers, and did not eject fired casings (unlike a semi-automatic firearm which does eject the casings). Also, the casings at the scene were of a different caliber than the victim's revolver, and they were not near his body. As the state emphasized, the fired shell casings were found in two distinct areas. Notably, each collection of casings was associated with a different caliber of bullet. There was testimony a firearm ejecting these casings would typically eject to the right (even for a left-handed shooter).

{¶35} Appellant claims the two clusters of different caliber casings did not indicate two shooters because the state did not specifically ask the ballistic expert whether the 9mm casings could have been fired from the same firearm as the .45 caliber casings. However, this conclusion can be understood from the expert's testimony.

{¶36} The expert said he could match casings to each other and could determine if casings were fired from the same firearm or different firearms. (Tr. 667, 669-670). He also said he did a side-by-side microscopic comparison of all of the shell casings. (Tr. 676, 688). The expert concluded the eight 9mm shell casings were all fired from the same weapon. (Tr. 676). He separately concluded the six .45 caliber shell casings were all fired from the same weapon. (Tr. 677). He said they were not fired from the revolver, noting they were different in caliber. (Tr. 679).

{¶37} The expert also found the markings on the 9mm casings were "very course/parallel" and the "course breach face marks" consistent with marks left on a casing when fired through a gun manufactured by Hi-Point; although other guns were not excluded, this was the most likely type of gun to have fired the 9mm casings. (Tr. 676, 678, 689). In contrast, he was unable to name a potential brand of gun which fired the .45 caliber casings as the markings (which matched each other) were "pretty general." (Tr. 689).

**{¶38}** In noting the two slugs recovered from the victim's body were not fired from the .32 revolver and were more likely to be 9mm than .45 caliber, the expert explained a 9mm was an intermediate caliber bullet. (Tr. 680, 684). He said a .45 caliber is "a much bigger bullet" as the diameter is larger than that of a 9mm bullet. (Tr. 694).

**{¶39}** The totality of the expert's testimony indicated two different firearms were used to produce the two collections of different caliber casings at the scene. We additionally emphasize the location of Hopkins on the shooting video was consistent with where the .45 caliber casings were found. And, the location of the 9mm casings (north of the .45 caliber casings) was consistent with Appellant's position trailing behind Hopkins and the victim as they walked south and consistent with Appellant's direction of entry into the frame of the shooting video.

**{¶40}** The numerous gunshot wounds suffered by the victim and the diverse trajectories are also relevant to the totality of the circumstances existing in this case. The victim suffered nine wounds from upper chest to ankle. Some traveled from right to left. The slug which lodged in fat by the colon entered from the front of the body and traveled from left to right and up. (Tr. 538-539). The other slug lodged in the victim's body entered from the back of the victim's thigh from right to left and up. (Tr. 542).

**{¶41}** Appellant emphasizes the forensic pathologist's inability to opine whether the different trajectories suggested more than one shooter. She noted the condition of the gunshot wounds could depend on the location of the shooter's position and whether the individuals were moving. (Tr. 552). Still, she did not rule out the significance of the different trajectories. Moreover, her testimony did not evaluate the features of the scene, the different collections of casings, and the position of Hopkins when seen firing on the video.[1]

**{¶42}** The state's case was not based solely on Appellant's presence at the scene. The not guilty verdict of aggravated murder was not inconsistent with the theory of Appellant purposely participating or aiding in the victim's death. Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Trees*h, 90

---

[1] The state also suggested Appellant fired a bullet into the victim's heart when he approached the body off camera due to the forensic pathologist's testimony about the heart shot leaving an exit wound bruise often seen when a victim is pressed against a hard surface such as the ground. Appellant points out there was no shell casing found by the body.

Ohio St.3d 460, 485, 739 N.E.2d 749 (2001); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991) (overturning the rule that circumstantial evidence must be irreconcilable with any reasonable theory of innocence). *See also State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991) ("A conviction can be sustained based on circumstantial evidence alone.").

{¶43} Viewing all of the evidence and rational inferences in the light most favorable to the prosecution, some rational juror could find Appellant fired shots at the victim with purpose to cause his death and the shots he fired either were the cause of death or aided and abetted Hopkins whose shot caused the victim's death. There was sufficient evidence to find Appellant guilty of murder and having a weapon while under disability. Accordingly, Appellant's sufficiency argument is overruled.

A/E 2: WEIGHT OF THE EVIDENCE

{¶44} Appellant's second assignment of error alleges:

"Appellant's convictions were against the manifest weight of the evidence as the state did not produce any evidence that Appellant ever held and/or fired a gun, and/or that he was in any way complicit with the murder of Brandon Wylie."

{¶45} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. Although the effect of the evidence in inducing belief is evaluated, weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion (as opposed to the burden of production involved in a sufficiency review). *See id.* at 390 (Cook, J., concurring).

{¶46} When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131

Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶47}** Although only two of the three appellate judges on the panel must vote to reverse a conviction on the grounds of sufficiency of the evidence, the situation is different when a defendant asks for reversal of a jury verdict on weight of the evidence grounds. Where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. *Thompkins*, 78 Ohio St.3d at 389, citing Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Id.*

**{¶48}** Appellant's brief incorporates his sufficiency arguments into his weight of the evidence argument. We additionally note the statement of facts in Appellant's brief points out Witness A never met Appellant until the gathering on the night of the shooting and admitted she did not know Appellant's name until she saw it on the news. (Tr. 466, 473). Appellant also states Witness B's testimony did not confirm his presence at the gathering. He points out these witnesses were not present at the apartment complex at the time of the shooting, emphasizing they picked up Moore and Ford at the outskirts of the apartment complex after the shooting.

**{¶49}** The credibility of the witnesses presented by the state and the defense were questions for the jury. Witness B identified Appellant as being present but then at trial named only Moore, Ford, and Hopkins as present and claimed she did not see the fourth person's face. She seemed uncooperative with wavering answers. Witness A said Appellant was at the gathering and identified him. She took orders for drinks and snacks from this group minutes before the shooting. From the written record, she appears to be a credible witness.

**{¶50}** Although these witnesses retrieved Moore and Ford from the street near the street entrance to the apartment complex, this was four minutes after the shooters fled the scene of the shooting. This was portrayed in the video and confirmed by a detective

who explained the two individuals running behind Building L were not the two at the scene of the shooting. Another detective further clarified, based on his familiarity with the four males, how Moore and Ford were distinguishable from Hopkins and Appellant on the video. Clearly, the two people leaving the apartment complex four minutes after the shooting (who were identified as Moore and Ford) were distinct from the individual seen shooting on video and the person with him. The latter two fled from the location of the body together immediately after the shooting and were identified as Hopkins and Appellant.

{¶51} Whether Detective Lambert was as familiar with Appellant as he claimed was a matter related to his credibility. *See State v. Reading*, 5th Dist. Licking No. 07-CA-83, 2008-Ohio-2748, ¶ 26 (where the witness identified the defendant as the suspect on the video, the court pointed out the jury had the opportunity to view the surveillance video as well as assess the credibility of the witness). This court viewed the videos which were played for the jury; the jury could use the video and its portrayal of the person identified as Appellant in ascertaining the weight to assign the detective's opinions. The admissibility of his opinion is further discussed in the next assignment of error.

{¶52} Appellant's brief also emphasizes the lack of DNA evidence connecting him to the shooting, suggesting the forensic scientist excluded him as the source of the DNA evidence recovered from the 9mm cartridges. However, this interpretation appears to be the result of reading only certain overly broad or confused follow-up questions. (Tr. 582, 595). When speaking of excluding Appellant, the forensic scientist was clearly speaking of being able to exclude him as the contributor to the *major* profile because this profile belonged to a *female*. The forensic scientist initially explained: "The swab from the eight 9mm cartridge casings was a mixture, the major profiles from an unknown female, and there's additional data present in this sample that does contain a male. However, it's not of sufficient quality for comparison to anybody. So, in essence, Brandon Wylie and Brian Donlow Jr. are excluded as being the *major* contributor to the sample." (Emphasis added.) She additionally specified, "I can tell that there's a male in the sample, but it's so low that I can't make any interpretations to it." (Tr. 581).

{¶53} On cross-examination, she was asked if she excluded the victim from the 9mm casings at which point she specified: "He's excluded from the data *that I can*

*interpret*, which belongs to an unknown female." She was then asked, "And the same thing was true for Mr. Donlow; you had a DNA sample card from him which also excluded him, correct?" The forensic scientist responded, "Yes, *from the data that I can interpret*." (Emphasis added.) (Tr. 595). Clearly, the forensic scientist did not exclude Appellant from contributing to the minor (male) profile found on the 9mm casings.

**{¶54}** Notably, the forensic scientist was asked if she expected to find quality DNA evidence on a casing that had been fired through a gun, and she replied: "Oftentimes we do not, or the amount is so low that we can't really make an interpretation of the data. It's not common that we would get a great DNA profile from cartridge casings." (Tr. 578). Similarly, the DNA found on the .45 caliber casings was not suitable for comparison. (Tr. 581-582).

**{¶55}** Our review of the entire record does not indicate this is the exceptional case in which the evidence weighs heavily against the conviction and requires the exercise of our limited "thirteenth juror" discretion to grant a new trial. *See Lang*, 129 Ohio St.3d 512 at ¶ 220. The evidence and inferences relied upon by the jury were not unbelievable, including the items discussed here and in the sufficiency assignment of error. Contrary to Appellant's allegations, the state presented more evidence than presence and flight to incriminate him in the murder. "When more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury." *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). In accordance, this assignment of error is overruled.

A/E 3: IDENTIFICATION

**{¶56}** Appellant's third assignment of error contends:

"Appellant was denied his right to a fair trial, pursuant to both the United States and Ohio Constitutions, when the trial court allowed the state's witness to identify him based on his walk."

**{¶57}** As Appellant acknowledges: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704. Appellant emphasizes the

"otherwise admissible" portion of the rule. He then points to the rule stating a lay witness's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701.

{¶58} The rule was enacted because "the practical possibility of distinguishing between fact and opinion proved to be elusive, if not impossible to draw * * *." *State v. McKee*, 91 Ohio St.3d 292, 296, 744 N.E.2d 737 (2001) (noting a witness could previously only testify to facts, not opinions). The rule has been applied to testimony about "identity of a person" and "a person's health, age, or appearance." *Id.* (and also allows a non-expert to present a lay opinion about a collection of facts even if it is grounded in experience or specialized knowledge).

{¶59} Detective Lambert's testimony identified Hopkins as the person leading the victim and then firing a gun at the victim in the video. And, he identified Appellant as the person following the victim and then entering the scene immediately after the shots were fired. Appellant suggests the state did not elicit a sufficient foundation to allow the detective to present his identification opinion. Appellant claims the detective did not indicate his opinion was rationally based on his past perceptions and familiarity with Appellant as he failed to specify identifying characteristics of Appellant's walk or estimate how much time he spent with Appellant.

{¶60} Appellant claims the detective purported to identify him based on only his walk and says this case is distinguishable from cases where a witness can explain why a defendant's walk was distinctive, such as a limp. He also attempts to distinguish a case where the Tenth District upheld the trial court's decision to admit the identification by the defendant's probation officer (who watched from a "less than good quality" video and said she knew the defendant for years and considered the facial features and build of the suspect in the video) and by the detective assigned to the case (who said he recognized the defendant as the suspect in the video due to his walk, gestures, build, and hairline). *See State v. Bond*, 10th Dist. Franklin No. 11AP-403, 2011-Ohio-6828, ¶ 6, 8-9, 13, 17-18 (where the detective only met the defendant during an interview after the probation officer identified the defendant in the video).

Case No. 20 MA 0049

**{¶61}** The trial court cited a case where: a video showed the suspect arriving at and leaving the scene of a robbery; the details of the suspect's face were blurry; and the detective was permitted to provide a lay opinion identifying the defendant as the suspect after stating he had had opportunities to personally observe the defendant's appearance, gait, and posture over a period of two years. The Second District found no error under Evid.R. 701 and concluded "the jury could have reasonably determined for itself whether [the detective's] identification of Coots as the perpetrator was reasonable under the circumstances." *State v. Coots*, 2015-Ohio-126, 27 N.E.3d 47, ¶ 14, 17-19 (2d Dist.).

**{¶62}** Here, the detective stated through the course of his years on the police force, he has come into contact with various local individuals, including at public functions and during hours of interviews. (Tr. 785). He said he was familiar with Appellant and Hopkins and identified them from the stand. (Tr. 790). He said he previously spoke with and watched each of them and answered in the affirmative when asked if he was "familiar with the way these men carry themselves, the way they walk, things of that nature?" (Tr. 790-791).

**{¶63}** As the video was played, the detective identified Hopkins as the person seen shooting in the video and said he recognized him from his hairstyle, the way he walked, and his clothing (the shorts were elsewhere said to have an unusual logo matching the ones worn by Hopkins in a Facebook post). (Tr. 793, 795). The detective then identified Appellant as the individual with the shooter in the video. (Tr. 794, 796). He answered affirmatively when asked if his identifications were consistent with "the way they carry themselves" and "the way they walk." (Tr. 794-795). The detective also pointed out the males he was identifying "all" had different body builds. (Tr. 798).

**{¶64}** He was also familiar with Lorice Moore and Chasmar Ford and identified photographs of these men. (Tr. 786-788, 805-806). When asked if there was "any way" either of the suspects in the video could be Moore or Ford, the detective said: "No. That's Stephon Hopkins firing the gun, and that's Brian Donlow coming up after entering the path." (Tr. 796-797). He then identified Moore from a separate camera's video, noting he has spent "a lot of time" with Moore and could tell it was him by his build, the way he moved, and the shape of his face. (Tr. 797). He noted Moore was lean, muscular, and

older and Ford was darker, shorter, and stockier than the other three males (and had "a lot" of facial hair and sideburns at the time). (Tr. 798-799).

**{¶65}** Before Detective Lambert testified, there was an off-the-record discussion about his identification from the video. When they returned to the record, the court noted the detective had prior interaction with the defendants due to alleged criminal violations. To avoid issues with the defense claiming prejudice from an officer stating how he knew the defendants, the court cautioned the state not to elicit statements from the detective on his knowledge of the defendants due to their prior criminal activities. (Tr. 749-750, 752). The court noted the defense may also have to exercise caution in questioning the detective's familiarity with the defendants to avoid opening a door for the state to question him further on specifics. (Tr. 750).

**{¶66}** Defense counsel said he was objecting because Evid.R. 701 required the detective to establish a foundation for his knowledge by testifying on his familiarity with the defendants but the detective could not delve into the basis for the knowledge without prejudicing the defense. (Tr. 751). The court opined Evid.R. 701 only requires enough of a foundation to show the witness can adequately identify someone because of prior contact. The court also stated the remaining concern goes to the weight of the evidence and the jury can view the video to ascertain "how well he can then identify them on the video * * *." (Tr. 752-753).

**{¶67}** It appears the defense objection involved an attempted strategy: to prohibit the state from eliciting the detective's knowledge of Appellant due to the implications of Appellant's prior involvement with the detective and to then claim the defense's success on this ruling meant the state could not satisfy the foundation under Evid.R. 701 thereby precluding all testimony from the detective identifying Appellant. We note there was no objection during the detective's testimony. Regardless, even accepting as a timely objection the pre-testimony discussion (which occurred at a break during a different detective's testimony), the argument fails.

**{¶68}** "We must review the trial court's decision whether to admit evidence under Evid.R. 701 according to an abuse-of-discretion standard, which has been defined as connoting 'more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court'. *City of Urbana ex rel. Newlin v.*

*Downing*, 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989). In reviewing for an abuse of discretion, a trial court's "decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo" would have handled the issue differently. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶69} The record demonstrates the detective could have gone into greater detail for the jury about his various opportunities to study Appellant over a period of time; however, the court prohibited the detective from doing so at the urging of the defense in order to avoid telling the jury about the prior criminal investigations the detective conducted as to Appellant. The court's handling of the situation was not arbitrary or unconscionable, and there was a sound reasoning process behind the decision. The detective said he was familiar with Appellant, Hopkins, and other individuals from prior interactions where he spoke to them and observed them. He said he recognized them from their body build, walk, and the way they carried themselves. He spoke of hairstyles and face shapes as to some of the males. And, he explained how Moore and Ford could be distinguished from Appellant and Hopkins. The trial court could have reasonably concluded the detective's identification testimony was "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. This court concludes the trial court did not abuse its discretion in allowing the detective to express his opinion as to the identity of the people in the surveillance video. This left the credibility of the detective for the jury, as discussed in the prior assignment of error.

{¶70} We also note the detective testified to his extensive experience in visually identifying people from his encounters with them and then watching surveillance videos; he was often sought out by other officers in this endeavor. (Tr. 777-779). Testimony offered by a police officer is often considered lay testimony even though based on experience or specialized knowledge where the officer is using a reasoning process familiar in everyday life (as opposed to a reasoning process mastered by a specialist in the field to provide an expert opinion). *State v. Baker*, 2020-Ohio-7023, 166 N.E.3d 601, ¶ 34-35 (7th Dist.) (detective testifying on cell phone location data based on map he

generated), citing *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 56 (allowing a police officer to testify as a lay witness or as an expert on gang tattoos) and *McKee*, 91 Ohio St.3d at 297 (drug user can offer lay opinion identifying drugs based on experience or specialized knowledge even though not an expert). This assignment of error is overruled.

<u>A/E 4 & 5: TIPS AS HEARSAY AND CUMULATIVE ERROR</u>

**{¶71}** Appellant's fourth and fifth assignments of error, which both relate to the same evidence, allege:

"Appellant was denied his right to a fair trial, pursuant to both the United States and Ohio Constitutions, when the trial court allowed the state to elicit hearsay testimony identifying Appellant."

"The cumulative effect of the hearsay errors outlined in Assignment IV, above, if not sufficient for reversal separately, denied Appellant of a fair trial and due process as contemplated by both the Ohio and United States Constitutions."

**{¶72}** Detective Zubal testified about the surveillance video he was involved in downloading and was then asked what else he did to assist Detective Bobovnyik in the investigation. Over objection, he disclosed his receipt of an anonymous voicemail from a female caller identifying Appellant and Hopkins as suspects. (Tr. 740-741). He then explained his Facebook search. (Tr. 756-766).

**{¶73}** Detective Bobovnyik testified over objection to obtaining the names of Appellant and Hopkins as suspects from the victim's family the day after the shooting. (Tr. 823-824). He then explained he immediately entered the names in the state's database (OHLEG), printed photographs, and put them in his file. (Tr. 824-825). He thereafter spoke of Witness B's identification of Appellant as the fourth male who attended the gathering before the shooting.

**{¶74}** Appellant points out the court had already sustained an objection and prohibited the victim's father from testifying to the names of suspects he received and provided to the police. (Tr. 421). Appellant argues it was inconsistent to allow the detective to present the names after ruling the victim's father could not. Assuming the father was the family member the detective was referring to, Appellant also expresses concern the tip was double hearsay. Yet, the trial court explained the rulings were not

<u>Case No. 20 MA 0049</u>

inconsistent as the court agreed with the state's argument that the testimony by the detectives was offered to show the next step in the investigation and not to prove the truth of the matter asserted (unlike the proposed testimony by the victim's father). (Tr. 746, 856-857). Appellant acknowledges the general law allowing a police officer to present, as nonhearsay, information which caused the officer to engage in various investigation steps. However, Appellant emphasizes additional law which states the information becomes hearsay if it connects the defendant to the crime on trial.

{¶75} Appellant states the alleged error in admitting each of the two tips was not harmless because identification was the key issue and the evidence of his identity was not strong. He also urges that even if each instance of inadmissible hearsay was individually harmless, the two pieces of hearsay constituted cumulative error when considered together. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223 (under the cumulative error doctrine, a conviction can be reversed when the cumulative effect of errors in a trial deprived a defendant of a fair trial even though each instance of trial court error was not individually cause for reversal).

{¶76} The state points out the detectives did not specify what was said by the person who left the anonymous voicemail or what was said by the family member of the victim. The state suggests the use of the word "suspect" in the detectives' testimony was not incriminating as it did not mean either speaker informed the police Appellant was a perpetrator.

{¶77} Hearsay is "a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). If the statement was not offered to prove the truth of the matter asserted, then it is not hearsay.

{¶78} "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980) (finding the officers' testimony on their receipt of a tip about a gambling operation in the town was not hearsay as it was offered to explain the subsequent investigative activities of the witnesses and was not offered to prove the truth of the matter asserted). Therefore, "[a] law-enforcement officer may testify about a declarant's out-of-court

statement for the nonhearsay purpose of explaining the next investigative step." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 136. *See also State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 117 (the detective's testimony stating the defendant became a suspect in the murder after the police received a tip was nonhearsay).

**{¶79}** However, "such testimony is not permitted if the statement in question 'connect[s] the accused with the crime charged'." *Clinton*, 153 Ohio St.3d 422 at ¶ 136, quoting *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27 (although not criticizing the officer's explanation as to why the officer obtained a photograph of the defendant or the officer's receipt of information implicating the co-defendant). In *Ricks*, the Court ruled: "in order for testimony offered to explain police conduct to be admissible as nonhearsay, the conduct to be explained should be relevant, equivocal, and contemporaneous with the statements; the probative value of statements must not be substantially outweighed by the danger of unfair prejudice; and the statements cannot connect the accused with the crime charged." *Ricks*, 136 Ohio St.3d 356 at ¶ 27 (after observing the confrontation clause does not cover nonhearsay).

**{¶80}** The *Clinton* Court found the trial court should not have permitted an officer to testify the rape victim identified the defendant as the suspect merely because it showed his next investigative step. *Id.* at ¶ 135-137. The Court said the officer could have explained how he pursued his investigation without linking the defendant to the rape. *Id.* at ¶ 137, citing *Ricks*, 136 Ohio St.3d 356 at ¶ 51 (French, J., concurring in judgment only, with two other justices agreeing: "It is usually possible to explain the course of an investigation without relating historical aspects of the case, and in most cases, testimony that the officer acted 'upon information received,' or words to that effect, will suffice"), citing 2 McCormick, *Evidence*, Section 249, 193-195 (7th Ed.2013). Still, the Court found the admission of the officer's testimony about whom the rape victim named as a suspect was harmless beyond a reasonable doubt. *Clinton*, 153 Ohio St.3d 422 at ¶ 138 (where DNA evidence linked the defendant to the rape).

**{¶81}** In another case, the Supreme Court found the trial court should not have permitted an officer to testify she heard a missing person was present during a homicide, which prompted her to engage in certain activities to locate the missing person. The

Court said this violated the principle in *Ricks* because it went beyond the nonhearsay purpose of explaining why the officer was trying to locate the missing person and supported the state's theory that the defendant killed the missing person because he witnessed the prior murder: "Viewed for its truth, [the officer's] statement connected the two deaths." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 188-189. However, the Court found the error was harmless beyond a reasonable doubt. *Id.* at ¶ 190.

**{¶82}** Here, the investigative conduct was relevant, equivocal, and contemporaneous with the statements, and the probative value of statements was not substantially outweighed by the danger of unfair prejudice. The part of the statements regarding Hopkins did not necessarily connect Appellant with the crime. The part of the statements pointing the police toward Appellant vaguely connected Appellant with the crime charged by disclosing two unknown people reported to the police that he was a "suspect." These statements were not much more detailed than a statement such as: "upon information received, [I retrieved photographs of the defendant]" (language suggested by three justices in *Ricks* and seemingly cited as acceptable by the *Clinton* court).

**{¶83}** Even if the trial court should have excluded the statements under *Ricks* as they tended to connect Appellant to the crime charged, the errors were individually and cumulatively harmless. A defendant does not have a constitutional right to an error-free or perfect trial. *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996), citing *United States v. Hasting*, 461 U.S. 499, 508–509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). *See also* Evid.R. 103(A). "[E]vidence errors that are prejudicial because they improperly affect the verdict will be excised from the record with the remaining evidence weighed to see if there is evidence beyond a reasonable doubt of the appellant's guilt * * *." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33 (same harmless error test for constitutional and non-constitutional error).

**{¶84}** We refer to our Statement of the Case and the prior assignments of error and offer a brief recap here. The testimony of Witness B identified the four males present

at the gathering minutes before the shooting, including Appellant. A video showed two of those males leaving with the victim. The view of the person identified as Appellant was fairly clear on the video showing him following behind the victim. The detective identified Appellant based on his familiarity with him.

**{¶85}** The detective identified Hopkins as the person captured on video shooting multiple rounds in victim's direction while facing the camera (from the position where the six .45 caliber casings were collected). The detective also identified the other two males who were seen leaving the apartment complex separate from and after the shooter; he confirmed they were not the two males who fled the scene of the shooting.

**{¶86}** The suspect identified as Appellant ran into the shooting scene from the general direction of the collection of the eight 9mm casings. The inference that Appellant came from the location of the 9mm casings was also consistent with the video from the other camera showing him trailing behind Hopkins and the victim. His approach to Hopkins during the shooting and his manner suggested his complicity with the suspect seen shooting on film. He also approached victim's body with his back to the shooter and then fled with the shooter.

**{¶87}** We conclude the detective's disclosure that an anonymous tip provided Appellant's name as a suspect was harmless beyond a reasonable doubt under the totality of the circumstances. This court further concludes the other detective's disclosure that a member of the victim's family provided Appellant's name as a suspect was also harmless beyond a reasonable doubt under the circumstances of this case.

**{¶88}** Regarding Appellant's claim of cumulative error as to the two disclosures within this assignment of error, the disclosure about a family member of the victim naming Appellant as a suspect would not have added to the effect of the earlier disclosure about an anonymous tip naming Appellant as a suspect. The prejudice level from one detective's disclosure to the other detective's disclosure would not increase under the circumstances herein. This assignment of error is overruled.

**{¶89}** For the foregoing reasons, the trial court's judgment is affirmed.

Donofrio, P J., concurs.

Waite, J., concurs.

Case No. 20 MA 0049

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**